

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-11-00385-CV

ERMA GONZALES RAMIREZ, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE
ESTATE OF RAYMOND RAMIREZ, DECEASED, AND AS NEXT FRIEND OF L.R., J.R.,
M.R., AND R.R., MINOR CHILDREN, JANIE CROSBY, SAMUEL LEE JACKSON,
INDIVIDUALLY, AND NEXT FRIEND OF T.C.J., A MINOR CHILD, AND
AS PERSONAL REPRESENTATIVE OF THE ESTATE OF
REXEE JO JACKSON, DECEASED, APPELLANTS

V.

ROBERT GARCIA AND CUAHUTEMOC ("TIM") GONZALEZ, APPELLEES

On Appeal from the 154th District Court
Lamb County, Texas
Trial Court No. 17,796, Honorable Felix Klein, Presiding

August 29, 2013

## OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Samuel Lee Jackson, individually, as next friend of his minor son, and as

personal representative of the estate of Rexee Jo Jackson, appeals the trial court's

summary judgment in favor of defendant, Cuahutemoc "Tim" Gonzalez. Erma Ramirez,

individually and as next friend of five minor children, and Janie Crosby, individually, also

appeal the trial court's summary judgment in favor of Gonzalez on their claims against

him.  Appellants bring to the Court a variety of issues relating to Gonzalez's liability for a fatal traffic collision resulting in the death of three people.  We will affirm in part and reverse and remand in part.

Factual and Procedural History

In addition to his several other duties associated with the farming business, Gonzalez is the owner and sole proprietor of Gonzalez Farms, an entity engaged in the custom harvesting business.  In this particular instance, Gonzalez contracted with Chester Farms to harvest silage.  The verbal agreement between Chester Farms and Gonzalez included the task of hauling the harvested silage from the Chester Farms field to the Littlefield Feedyard.  Chester Farms agreed to pay Gonzalez $6.00 for each ton harvested and delivered to the feedyard and eighteen cents per mile for the hauling.

As was typical, Gonzalez utilized his own equipment, including harvesters, a combine, grain carts, plows, rakes, and three eighteen-wheeler trucks.  However, his own trucks were insufficient to efficiently haul the volume of harvested silage and, after Gonzalez was contacted by a number of other drivers looking for this type of work, he utilized them as well.  One such driver was Robert Garcia, owner of 3R/Garcia Trucking and with whom Gonzalez had not previously done business.  When Garcia first contacted Gonzalez, Gonzalez informed Garcia that there was no need for extra trucks and, therefore, no work available at that time.  Garcia called Gonzalez back about a week later and learned that Gonzalez did have a need for extra trucks and extra drivers at that time.  Garcia and two drivers arrived at the designated location with a total of three seemingly well-maintained eighteen-wheeler trucks and carried on the business of

2

hauling silage from field to feedyard.  Beginning in mid-September 2009, Garcia and the other 3R/Garcia Trucking drivers apparently hauled loads for Gonzalez without incident.

Gonzalez agreed to pay to the truck drivers $2.75 per ton delivered to the feedyard and eighteen cents per mile, meaning that Gonzalez kept $3.25 of the $6.00 Chester Farms agreed to pay for each ton harvested and delivered.  Gonzalez Farms employed two harvester operators, one of them being Gonzalez's brother, Javier Gonzalez.  In the field, Javier operated one of the harvesters, which would empty the harvested silage through a spout into the bed of a trailer.  This process called for a coordinated effort between the harvester operator and the truck driver.  When the silage reached the top of the trailer walls or very nearly so, Javier would signal to the truck driver that the trailer was full, and the truck would then deliver the load to the feedyard.

Due to weather conditions, harvesting was halted over the weekend of October 3–4, 2009, and delayed throughout the misty and foggy morning of Monday, October 5.  When the weather conditions and moisture content of the silage were acceptable, harvesting resumed sometime in the afternoon of Monday, October 5.  When harvesting resumed, Garcia brought the usual three eighteen-wheelers belonging to 3R/Garcia but also brought along a fourth truck, a smaller 1980 International tandem truck belonging to Garcia, along with a fourth driver, Raymond Ramirez.

Without incident, apparently, the tandem truck lined up along with the other trucks and was loaded with silage.  After it was loaded, it started en route to the feedyard.  But along the relatively short route, tragedy stuck when a tire blew out on the tandem truck, causing Ramirez to lose control of the loaded truck and career headlong

3

into oncoming traffic where the SUV driven by Tammy Jackson and carrying her teenaged daughter, Rexee Jo, was travelling. The head-on impact killed Tammy and Rexee Jo instantly, and Ramirez also died a short time later at the hospital.

Jackson, father of Rexee Jo and former husband of Tammy, sued Garcia and Gonzalez; Ramirez and Crosby intervened. Gonzalez moved for traditional and no-evidence summary judgment against Ramirez and Crosby, and the trial court granted both motions in May 2011. Their claims against Garcia remained. On August 22, 2011, the trial court signed a default judgment against Garcia in favor of Jackson, awarding over $4.5 million and severing Jackson's claims against Garcia. Jackson's claims against Gonzalez remained, as did, it seems, Ramirez and Crosby's claims against Garcia, not having been specifically identified in the severance language. Jackson and Gonzalez filed competing hybrid motions for summary judgment. The trial court granted Gonzalez's no-evidence motion, denied Jackson's, and found it unnecessary to rule on Gonzalez's traditional motion for summary judgment.

As noted, when it signed the default judgment against Garcia in favor of Jackson, the trial court severed Jackson's claims against Garcia, leaving Ramirez and Crosby's claims against Garcia. In its final order, the trial court specifically severed both Jackson's and Ramirez and Crosby's claims against Garcia so as to make final both summary judgments in favor of Gonzalez. The default judgment in favor of Jackson against Garcia had already been severed, not appealed, and appears to be final as to

4

Jackson's claims against Garcia. Ramirez and Crosby nonsuited their claims against Garcia, and those claims are not before us; Garcia is not a party to this appeal.[1]

At issue are two summary judgments granted in favor of Gonzalez against two separate sets of appellants, meaning that there are, in essence, two appeals. Though some of the issues raised by appellants are similar, each seems to raise slightly different claims below and issues on appeal. What both sets of appellants do have in common is that both sets are trying to impose liability on Gonzalez.

Standard and Scope of Review

A no-evidence motion for summary judgment is essentially a motion for a pretrial directed verdict. See TEX. R. CIV. P. 166a(i); King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 750–51 (Tex. 2003). After an adequate time for discovery, a party without the burden of proof may, without presenting evidence, seek summary judgment on the ground that there is no evidence to support one or more essential elements of the non-movant's claim or defense. TEX. R. CIV. P. 166a(i).

Because a no-evidence summary judgment is essentially a pretrial directed verdict, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. Chapman, 118 S.W.3d at 750–51. So, when called on to review a no-evidence summary judgment, we review the evidence presented by the motion and response in the light most favorable to the

---

[1] For clarity, the following parties remain: (1) Jackson: plaintiff/appellant, Tammy's ex-husband and Rexee Jo's father; (2) Ramirez: intervenor/appellant, widow of Raymond Ramirez; (3) Crosby: intervenor/appellant, Raymond Ramirez's mother; and (4) Gonzalez: defendant/appellee, harvesting business owner who hired Garcia to provide trucks and drivers who, in turn, hired Ramirez.

party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. See Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex. 2006) (citing City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005), and Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 208 (Tex. 2002)).

A no-evidence summary judgment is improper if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact on a challenged element. TEX. R. CIV. P. 166a(i); see Forbes Inc. v. Granada Biosciences, Inc., 124 S.W.3d 167, 172 (Tex. 2003); Chapman, 118 S.W.3d at 751. "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." Jelinek v. Casas, 328 S.W.3d 526, 532 (Tex. 2010) (quoting Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)); Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004). Put another way, a no-evidence point will be sustained when "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." Chapman, 118 S.W.3d at 751 (citing Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997)). More than a scintilla of evidence exists if it would allow reasonable and fair-minded people to differ in their conclusions. Forbes Inc., 124 S.W.3d at 172 (citing Chapman, 118 S.W.3d at 751, and Havner, 953 S.W.2d at 711).

6

Negligent Loading or Overloading

In his first point of error, Jackson contends that the trial court erred by granting Gonzalez's no evidence motion for summary judgment on Jackson's allegation of negligent loading of the tandem truck Ramirez was driving.  Gonzalez contends that the evidence of breach on which Jackson relies is effectively no evidence and, therefore, the trial court did not err by concluding that Jackson failed to bring forth more than a scintilla of evidence to support the breach element of his cause of action in negligence.

Analysis

Bearing in mind the proper standard of review, our task becomes to determine whether Jackson, as nonmovant, produced any evidence of probative force to raise a fact issue on the material questions presented.  If Jackson failed to bring forth more than a scintilla of evidence on one of the challenged essential elements of his cause of action in negligent overloading, then no-evidence summary judgment was proper.  See id.  In alleging negligence in the loading of the truck Ramirez was driving, Jackson bore the burden of proving "[(1)] existence of a legal duty, [(2)] a breach of that duty, and [(3)] damages proximately caused by the breach."  Rodriguez-Escobar v. Goss, 392 S.W.3d 109, 113 (Tex. 2013) (per curiam) (quoting IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004)); see Kroger Co. v. Elwood, 197 S.W.3d 793, 794 (Tex. 2006) (per curiam)

Duty is the threshold inquiry, which is a question of law for the court to decide.  See Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990).  For purposes of analysis, we observe that there is some evidence that Gonzalez's

7

employee, Javier, operated the harvester, directed the filling of the trailer, and signaled to the truck's driver when the trailer was full. Based on these observations, we will assume there is some evidence that Gonzalez voluntarily undertook a duty with respect to safely loading the tandem truck. Our inquiry does not end, however, with that assumption. Even assuming that Jackson did bring forth more than a scintilla of evidence that Gonzalez assumed such a duty to not overload the tandem truck, there remains the issue of breach of that duty. See Rodriguez-Escobar, 392 S.W.3d at 113.

As evidence of breach, Jackson points to the responding DPS Trooper William Pace's notation in his accident report under the heading "Damage to Property Other Than Vehicles" that listed "Silage Cargo-20 tons." Jackson maintains that Pace's notation in conjunction with the expert testimony that this particular tandem truck could safely carry no more than 13.8 tons is sufficient to clear the no-evidence hurdle.

However, Pace, by his own admission, was merely guessing or estimating the size of the load when he made the "twenty tons" notation in his report; he does not contend that he was able to accurately weigh the load. In his affidavit, Pace explained his "twenty tons" statement:

> I do not have any personal knowledge that the 1980 International being driven by Raymond Ramirez, Jr. was actually hauling 20 tons of silage, nor did I do any independent testing or analysis to determine the weight of the load. It was impossible to determine due to it being spilled all around the accident site. Additionally, I do not have any personal knowledge of the moisture content of the silage that was being hauled or the load history of the 1980 International truck. I guessed 20 tons after inquiring with Littlefield Feedyard about their estimate of average weight of all trucks that were unloading silage. The silage that spilled from the truck after the accident was never weighed. It could not be utilized because it was rendered damaged goods due to the diesel fuel that had spilled on it.

8

There was no way to get an accurate weight of the spilled silage, and 20 tons was the weight purported to me by Little Feedyard as an estimate of the average of all trucks, including semi-truck-trailer rigs, unloading from Chester Farms.

Even indulging, as we must, every reasonable inference in favor of nonmovant Jackson, we cannot conclude that the "twenty tons" notation is more than a scintilla of evidence that the tandem truck was overloaded the day of the collision. See Ridgway, 135 S.W.3d at 601–02 (concluding that evidence of fire and evidence that expert "suspect[ed]" the electrical system caused the fire was "no more than a scintilla of evidence" and therefore was no evidence of manufacturing defect). To raise a genuine issue of material fact, the evidence must transcend mere suspicion: "Evidence that is so slight as to make any inference a *guess* is in legal effect no evidence." Id. (emphasis added). Pace's accident notation was just that—a guess, an estimate based on the feedyard's figures on average weights of other trucks, a number of those trucks being larger trucks than the tandem truck involved in the collision. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." Chapman, 118 S.W.3d at 751 (quoting Kindred, 650 S.W.2d at 63). On this record, Pace's notation does nothing more than that and is, therefore, insufficient to overcome Gonzalez's no-evidence motion for summary judgment on this issue.

The record contains no other evidence of how much silage the tandem truck was hauling that day. Alternatively, Jackson points to Gonzalez's testimony that a truck like the tandem truck involved in the collision probably could haul a load of twelve to fourteen tons. According to Jackson's expert's calculations, the maximum load for this particular tandem truck was 13.8 tons, given the specifications and safety rating of the

9

truck.  Gonzalez's testimony that the truck could, in theory, haul a fraction of a ton more than what the specifications of the truck would dictate, according to Jackson, is additional evidence that the truck was overloaded.  We disagree.  Gonzalez's testimony that the truck *could* have hauled a load of twelve to fourteen tons of silage, regardless of whether such testimony is an accurate statement on the payload of the truck, is of no moment when we review the record for evidence of the *actual* weight of the load the tandem truck was hauling the day it collided with the Jacksons' vehicle.  That is, regardless of what Gonzalez thought the load could be in such a truck, there remains no evidence of the weight of the *actual* load on the day of the collision.

Without evidence of how much silage had been loaded into the truck Ramirez was driving, Jackson's negligent loading cause of action cannot survive a no-evidence motion for summary judgment.  See Rodriguez-Escobar, 392 S.W.3d at 113; see also TEX. R. CIV. P. 166a(i).  In response to the motion, Jackson failed to bring forth more than a scintilla of evidence on a challenged essential element of his cause of action.  Therefore, the trial court properly granted Gonzalez's no evidence motion for summary judgment on the issue of negligent loading of the truck that Ramirez was driving.

Statutory Employment

Another manner in which Jackson seeks to impose liability upon Gonzalez is by way of the principle of "statutory employment" under the federal motor carrier safety regulations (FMCSR), as adopted in Texas.

Generally

Statutory employment is a theory of vicarious liability created by the FMCSR. Omega Contracting, Inc. v. Torres, 191 S.W.3d 828, 848 (Tex.App.—Fort Worth 2006, no pet.) (op. on reh'g). The vicarious liability fiction of the statutory employee doctrine applies only to the extent necessary to insure the carrier's responsibility for the public's safety. See White v. Excalibur Ins. Co., 599 F.2d 50, 52–53 (5th Cir. 1979), superseded on other grounds by regulation as recognized in Simpson v. Empire Truck Lines, Inc., 571 F.3d 475, 476–77 (5th Cir. 2009); see also Sharpless v. Sim, 209 S.W.3d 825, 830 (Tex.App.—Dallas 2006, pet. denied) ("Regardless of the type of relationship between the carrier and the driver, however, the carrier is not excused from the regulations that treat the driver as a statutory employee for purposes of liability to the general public.").

Applicability and Definitions

Texas has adopted the FMCSR in part. See 37 TEX. ADMIN. CODE § 4.11(a) (2012) (Tex. Dep't of Pub. Safety, Gen. Applicability & Definitions). Among the FMCSR definitions adopted in Texas are the definitions of "employer" and "employee" set out in section 390.5 of the FMCSR. Martinez v. Hays Constr., Inc., 355 S.W.3d 170, 183 (Tex.App.—Houston [1st Dist.] 2011, no pet.); see 49 C.F.R. § 390.5 (2012).

An "employer" under the FMCSR is "any person engaged in a business affecting interstate commerce who owns or leases a commercial motor vehicle in connection with that business, or assigns employees to operate it." 49 C.F.R. § 390.5. As adopted in Texas, "interstate commerce" includes all movements by motor vehicle, both interstate

11

and intrastate, over the streets and highways of this state.  37 TEX. ADMIN. CODE §

4.11(b)(3).  Under the FMCSR, an "employee" is described as follows:

> any individual, other than an employer, who is employed by an employer
> and who in the course of his or her employment directly affects
> commercial motor vehicle safety.  Such term includes a driver of a
> commercial motor vehicle (including an independent contractor while in
> the course of operating a commercial motor vehicle), a mechanic, and a
> freight handler.

49 C.F.R. § 390.5.  Independent contractors are statutory employees under the FMCSR

definition set forth above only when they are "in the course of operating a commercial

motor vehicle."  Id.

Texas did not, however, adopt the FMCSR definition of "motor carrier," opting

instead to retain the definition outlined in the Texas Transportation Code:

> "Motor carrier" means an individual, association, corporation, or other legal
> entity that controls, operates, or directs the operation of one or more
> vehicles that transport persons or cargo over a road or highway in this
> state.

TEX. TRANSP. CODE ANN. § 643.001(6) (West 2011); 37 TEX. ADMIN. CODE § 4.11(b)(1).

Is Gonzalez a "Motor Carrier," "Ultimately Responsible"?

Two sister courts have explored the application of the Texas definition of "motor

carrier" in section 643.001 of the Texas Transportation Code in the context of statutory

employment.  See Castillo v. Gulf Coast Livestock Mkt., L.L.C., 392 S.W.3d 299, 303–

06 (Tex.App.—San Antonio 2012, no pet.); Martinez, 355 S.W.3d at 183–85.

The Martinez court examined a set of facts not dissimilar to the facts of the case

at bar.  In Martinez, Hays Construction had contracted with the Harris County Flood

Control District to perform excavation work on a bayou. Martinez, 355 S.W.3d at 173. As part of the contract, Hays Construction entered into an agreement with Sprint Sand & Clay to provide a location for the dirt excavated from the bayou worksite. Id. Hays Construction also contracted with third parties to remove the excavated dirt and deliver it to the Sprint location. Id. Hays Construction reached an agreement with "truck brokers," one of them being Moises Melendez, and asked these "brokers" to contact other drivers and trucking companies who could perform hauling services as well. Id. Melendez contacted a friend, Marcos Benitez, who, in turn, contacted Salvador Bello, the owner and sole proprietor of Bello Transportation. Id. at 174.

Bello recruited his brother, Delfino, to join in the work, and, for two days, Delfino hauled dirt from the bayou to the dump site without incident. See id. On his third day of work, however, his loaded truck collided with a car driven by Luis Martinez, who was fatally injured in the collision. Id. Martinez's family and estate initially sued Delfino, Salvador, Salvador's wife, and Bello Transportation but later also sued Hays Construction and Melendez, alleging among other things that they violated applicable provisions of the FMCSR as adopted in Texas. Id. at 174–75. More specifically, Martinez alleged that Hays Construction was the "statutory employer" of Melendez and the Bellos and was therefore vicariously liable for their negligence. Id. at 175.

The trial court granted summary judgment in favor of Hays Construction on all the claims against it. See id. at 177. Among the several arguments raised on appeal from that judgment was Hays Construction's contention that it was not a "motor carrier" and that, therefore, the FMCSR did not apply. See id. at 175–76, 184. The Martinez court noted that it was Hays Construction which was "ultimately responsible" for hauling

13

dirt from the bayou to the drop-off site.  Id. at 185.  The court also observed that it was Hays Construction which obtained the hauling permits and determined the ultimate destination for the load.  Id.  Further, Hays Construction employees actually loaded each dump truck, checked each driver's license and proof of insurance, and informed each driver where to take the dirt.  Id.  Hays Construction also indirectly paid the drivers for each load.  Id.  Viewing the cited evidence in the requisite light most favorable to Martinez, the court concluded that Martinez had raised a fact issue as to whether Hays Construction was a legal entity that "controls, operates, or directs" the operation of the dump trucks used to haul dirt for the excavation project such that it would fall within the Texas definition of "motor carrier."  Id.

Confronted with a rather different fact scenario and called on to determine the "motor carrier" issue, the San Antonio Court came to the opposite but fundamentally consistent conclusion that a plaintiff had failed to raise a fact issue concerning whether the defendant livestock auction barn was a "motor carrier" within the Texas definition. See Castillo, 392 S.W.3d at 306.  Castillo was an animal inspector present at a livestock auction barn where, in the vast majority of the transactions, the cattle owner himself delivers the cattle to the barn.  Id. at 301.  In the facts leading up to this particular case, however, Charles Hellen was driving a tractor trailer owned by another, unnamed person and was carrying livestock belonging to another, unnamed person.  See id.  As Hellen backed the truck into the designated unloading area, he struck and injured Castillo.  Id.  Castillo sued, and the trial court granted Gulf Coast Livestock Market's motions for summary judgment and entered judgment that Castillo take nothing.  See id.

Castillo contended that Gulf Coast Livestock Market (Gulf Coast) was liable for Hellen's negligence as Hellen's statutory employer under the FMCSR as adopted in Texas. Id. at 303. The San Antonio Court addressed the first issue: whether Castillo presented more than a scintilla of evidence that Gulf Coast was a "motor carrier." Id. at 303–04. In examining the issue, the court studied the Martinez court's decision and outlined the evidence Martinez relied on to conclude that, in that case, there was a fact issue concerning the definition of "motor carrier." Id. at 304 (citing Martinez, 355 S.W.3d at 173–74). The Castillo court then turned to the record before it, focusing on the relevant pieces of evidence Castillo presented in response. Id. at 304–05. In deposition testimony, Gulf Coast's managing owner acknowledged that Gulf Coast's website indicated that hauling was available but explained that this meant only that, as a way of accommodating its customers, Gulf Coast could find a truck and a driver for the few instances in which the cattle owner himself could not transport the cattle. See id. In those rare instances, Gulf Coast would identify a trucker to transport the livestock and would contact the trucker, providing him with information regarding load and location. Id. at 305.

Castillo contrasted this evidence with that in Martinez which supported the conclusion that Hays Construction was "ultimately responsible" for the transport:

Here, by contrast, Gulf Coast exercised no control over the drivers and the trucks. Gulf Coast contacted drivers on an as-needed basis to accommodate a small percentage of its customers. Gulf Coast's employees did not perform the loading, nor did Gulf Coast direct the size of the load at the pick-up site. Gulf Coast did not direct the route to be taken by the drivers, nor did it exercise any other control over the trucks or the drivers as they transported the livestock to Gulf Coast's auction barn. Although Gulf Coast's employees unloaded the livestock on Gulf Coast's premises, this was done only after the truck was parked in the unloading

15

area. In fact, the evidence showed that Gulf Coast employees were expressly instructed not to enter the trucks delivering livestock, and to begin unloading only after the truck was parked in the designated unloading area. Finally, the sign on Gulf Coast's property stating, "Loading and unloading of livestock is to be done by employees only," was not specific to drivers hauling livestock on behalf of a third party. The sign applied to all of the drivers delivering livestock to the auction barn.

Id. at 305–06. The San Antonio Court concluded that summary judgment was proper on the "motor carrier" issue because Castillo failed to bring forth more than a scintilla of evidence that Gulf Coast controlled, operated, or directed the operation of one or more vehicles that transport persons or cargo over a road in this state. See id. at 306 (citing TEX. TRANSP. CODE ANN. § 643.001(6)).

In the instant case, Gonzalez testified by deposition that he or his employee, Javier, would direct the drivers where to be in order to pick up the silage and where to deliver it. Javier or the other operator would operate the harvester in a manner so as to load the trailers, and the operator would signal to the driver when the trailer was full. Gonzalez explained that he decided what equipment to use on a given project and agreed that he was in control of the harvesting, but, he pointed out, it was the individual driver who decided which of the three available routes to take to the feedyard. Javier testified similarly by deposition, confirming that it was he who signaled to the driver that the trailer was full. He also elaborated on the amount of control Gonzalez retains over the conditions of the trucks used: the truck to be filled has to be approved by Gonzalez. When shown photographs of the tandem truck's tires, Javier responded that he would not have put tires in such poor condition on his truck.

The tandem truck and Ramirez showed up for the first time on that Monday afternoon. Gonzalez was ill that day and did not go to the harvesting site as he typically

16

would have done. He conceded that, had he personally seen the condition of the tandem truck, he would have refused to load silage into it. In his affidavit, Garcia testified that Gonzalez knew of and specifically requested the tandem truck that day because it would be more capable of dealing with the sandy soil conditions on the farm. Gonzalez denied having requested the tandem truck that day and maintains that he had not seen the tandem truck and had not seen Ramirez as a driver of any other 3R/Garcia trucks. Garcia also explained how the harvester operator sits in the best position, literally, to see when the trailer is full. Garcia's explanation is consistent with Javier's deposition testimony that he is the one who signals to the driver when the trailer is full.

The drivers were paid, as was Gonzalez, at the end of the harvest. Chester Farms and Gonzalez came to agreement on the eighteen cents per mile figure and then the task became Gonzalez's to get the silage hauled at eighteen cents per mile. Gonzalez was adamant, however, that "[he] set[s] the rates" for hauling. The per-ton and per-mile rates that Gonzalez paid to the drivers were included in the price Chester Farms agreed to pay for each ton of silage harvested *and* delivered.

Gonzalez maintained that responsibility for the condition of each truck fell on the truck's owner. He also explained that, while Javier noticed that the tandem truck was new to the line-up, he was not in the position to notice or inspect the truck's condition. Nonetheless, when confronted with photographs showing the poor condition of the tandem truck's tires, Gonzalez testified that he "would have advised him about the tires" and that he "could not have loaded him" with tires in that condition. He later repeated his position that he would not have loaded the tandem truck out of safety concerns had he seen its condition, noting that retreaded tires on the front steering axle was ill-

advised.  He described a very general inspection process, agreeing that he would not hire those who showed up with a bunch of pick-up trucks or an unsafe truck.  He acknowledged that he is in charge out in the field and can decide which trucks to load.  In his absence, such as the day of the collision, Javier would substitute for him and have the authority to decide whether to load a truck.  Gonzalez testified that he would expect Javier to fill only safe trucks and added that Javier was probably even more experienced than he was in terms of truck safety and maintenance.

Even though he recognized a driver's safety history as a very important concern, Gonzalez admits that, during a conversation with a fellow harvester, he did not ask about Garcia's history.  Gonzalez excused his failure to inquire into Garcia's safety at that point—after Garcia had been working for him: he had already seen Garcia's equipment and had no reason to be concerned about safety.  Gonzalez did not ask Garcia about his drivers and did not inquire into insurance, maintenance, or licensure.

From the record, we see that Gonzalez's employees loaded the trailers with silage and determined when the trailer was full.  Gonzalez also made the determination of which equipment to use and coordinated the harvesting in terms of moisture and weather conditions and directing drivers where to go and when.  The record suggests, too, that he retained some authority to control the transport from the farm to feedyard; by his own testimony, he had the authority to refuse to fill a truck he considered unsafe.  Further, there is evidence that, per the agreement with Chester Farms, it was Gonzalez who was "ultimately responsible" for getting the silage from the farm to the feedyard.  See Martinez, 355 S.W.3d at 185.  That being the state of the record, we conclude that Jackson responded to Gonzalez's no-evidence motion for summary judgment with more

18

than a scintilla of evidence that Gonzalez was a "motor carrier," "an entity that control[led], operate[d], or direct[ed] the operation of one or more vehicles that transport . . . cargo over a road or highway in this state." See TEX. TRANSP. CODE. ANN. § 643.001(6).

Is Gonzalez an "Employer"?

The Martinez court also noted that, for Hays Construction to be vicariously liable for Delfino's negligence, it must also qualify as Delfino's "statutory employer" under section 390.5 of the FMCSR. Martinez, 355 S.W.3d at 185. The Martinez court noted that the summary judgment evidence established that Salvador Bello owned the truck Delfino was driving at the time of the collision, and Martinez did not contend that Hays Construction leased the truck from Salvador Bello or Bello Transportation. Id. The court observed, however, that a motor carrier may still fall within the definition of "employer" if the motor carrier "assigns an employee to operate" a motor vehicle. See id. (quoting 49 C.F.R. § 390.5).[2] Finding that neither the FMCSR nor case law

_____

[2] Gonzalez maintains that this portion of the definition of "employer" necessarily refers to the previous clause concerning the ownership or leasing of a truck. In other words, he argues, we should read the "assigns employees to operate *it*" language as limited only to a "commercial motor vehicle" which is owned or leased by the alleged motor carrier. This reading requires us to construe the statute in a rather circular manner: "any person engaged in a business affecting interstate commerce who owns or leases a commercial motor vehicle in connection with that business, or assigns employees to operate [a commercial motor vehicle owned or leased by that person]." Read in such a manner, the second clause—the "or assigns" clause—would serve no real purpose because, in every case, the commercial motor vehicle in question would be owned or leased by the motor carrier; the only question to be answered would always be whether the motor carrier owned or leased the vehicle, and the "or assigns" language is mere surplusage and without purpose. We must avoid reading a statute in such way as to render a portion of it useless. See Martinez, 355 S.W.3d at 186–87 (expressing reluctance to adopt as a test for statutory employer status which would render the "or assigns" clause of "employer" definition meaningless); see also Columbia

specifically defined the term "assigns," the court applied the ordinary meaning of the term: to "appoint as a duty or task." Id. at 186 (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 74 (11th ed. 2003)).

Hays Construction emphasized that it exercised no control over the route that drivers took to the drop-off location and that it played no role in requiring independent contractor drivers to operate a particular truck at a particular time. Id. Drivers could make as many or as few trips as they deemed fit; Hays Construction did not control such decisions. See id. Nonetheless, the court pointed out, Martinez presented evidence that the drivers reported to Hays Construction's bayou worksite and that Hays Construction employees checked licensure and insurance, provided hauling permits, loaded the dump trucks, and informed the drivers of the unloading destination. Ultimately, the drivers returned their receipts to and were paid by Hays Construction. See id. Based on a view of such evidence in a light most favorable to the non-moving Martinez, the court concluded that Martinez raised a fact issue concerning whether Hays Construction assigned "drivers the specific task of operating a dump truck and transporting a load of excavated dirt to Sprint in the truck." Id. That said, no-evidence summary judgment was improper on the issue of whether Hays Construction was a statutory "employer" within the definition provided in section 390.5. See id. (citing 49 C.F.R. § 390.5).

---

Med. Ctr. of Las Colinas, Inc. v. Hogue, 271 S.W.3d 238, 256 (Tex. 2008) (noting that court "must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous"). Rather, we construe "it" in the "or assigns" clause to refer simply to "a commercial motor vehicle."

Keeping in mind that Gonzalez may be an "employer" under the FMCSR if he owns or leases a commercial motor vehicle or if he "assigns an employee to operate" a commercial motor vehicle, we see that much of the same evidence that raises a fact issue as to whether Gonzalez is a "motor carrier" also serves to raise a fact issue as to whether Gonzalez "assigns" employees to operate commercial motor vehicles and would, therefore, qualify as an "employer." See Martinez, 355 S.W.3d at 185–86. Although drivers were able to determine which route to take to the feedyard to deliver the silage, Gonzalez directed the drivers to arrive at the field to be harvested and provided the drivers with the location to which the silage must be delivered. Further, Gonzalez's employees loaded the trucks and signaled to the drivers when the trailers were full. Gonzalez also acknowledged that he can decide which trucks to load or not load, an issue we will explore in more detail when addressing Ramirez and Crosby's issues. That said, in much the same way that the record in Martinez raised a fact issue whether Hays Construction "appoint[ed] as a duty or task" the job of operating a truck and transporting a load of excavated dirt to a designated location, here, the record reveals more than a scintilla of evidence that Gonzalez appointed as a duty or task the job of operating a truck and transporting silage from and to designated locations. See id. at 186 (employing common meaning of "assigns" in absence of statutory definition).

Were Garcia and Ramirez "Employees"?

Certainly, the evidence suggests that both Garcia and Ramirez were drivers of a commercial motor vehicle and were therefore specifically included within the definition of "employee." While Gonzalez characterizes both Garcia and Ramirez as independent contractors, such a characterization does not end our inquiry on the issue of "employee"

21

status under the FMCSR. See 49 C.F.R. § 390.5; Martinez, 355 S.W.3d at 186. An "employee" under the FMCSR may include "an independent contractor while in the course of operating a commercial motor vehicle." 49 C.F.R. § 390.5.

Based on the contractual relationships, business arrangements, and details related to performance of the hauling duties, the Martinez court concluded that there was evidence sufficient to raise a fact issue as to whether Hays Construction hired Delfino as an independent contractor and that, therefore, Delfino could be an "employee" as "an independent contractor in the course of operating a commercial motor vehicle." See Martinez, 355 S.W.3d at 186. The relationships, arrangements, and performance details in the instant case roughly resemble those in Martinez, and, in fact, throughout much of the record, Gonzalez maintains that Garcia and Ramirez were independent contractors. There exists more than a scintilla of evidence that Garcia and Ramirez were "employees" of Gonzalez in terms of the FMCSR as adopted in Texas.

## Conclusion as to Jackson's Issues on Appeal

The trial court properly granted no-evidence summary judgment on Jackson's negligent overloading claims. However, because Jackson responded to Gonzalez's no-evidence motion for summary judgment with more than a scintilla of evidence that Gonzalez was a "motor carrier" and "employer" under the applicable provisions of Texas law and the FMCSR and that Garcia and Ramirez were "employees" under that same regulatory scheme, we sustain Jackson's point of error challenging the trial court's no-evidence summary judgment in favor of Gonzalez on the issue of statutory employment. The other issues he raises on appeal were raised in the alternative, and we need not

address those issues in light of our disposition of his second point of error. See TEX. R. APP. P. 47.1. We must now address the second portion of this appeal concerning the issues raised by Ramirez and Crosby.

Narrowing Issues and Scope of Review

Turning now to those issues, we see that they raise five issues on appeal, contending that the trial court improperly granted summary judgment in favor of Gonzalez for the following reasons: (1) Gonzalez owed Ramirez a legal duty; (2) Gonzalez assumed a legal duty; (3) there is more than a scintilla of evidence that Gonzalez entered into a joint enterprise with Garcia and Gonzalez would, therefore, be liable for Garcia's negligence, his negligence being an issue upon which all parties seem to agree; (4) Gonzalez, as a motor carrier, owed Ramirez a duty; and (5) the trial court erred by granting summary judgment when Gonzalez owed Ramirez a legal duty not to negligently hire an independent contractor.

We first begin by addressing which issues are properly before us as potential grounds for reversing the trial court's summary judgment. The record reveals that Ramirez and Crosby's Third Amended Petition in Intervention and their Second Supplemental Response to Gonzalez's hybrid motion for summary judgment were filed after the trial court granted summary judgment. That said, we have closely studied the timing of and the issues raised in their petitions and responses.

The trial court granted Gonzalez's motion for summary judgment and ordered that Ramirez and Crosby take nothing. The trial court signed its judgment on May 19, 2011. On May 23, 2011, Ramirez and Crosby filed their Third Amended Petition in

Intervention in which they first alleged negligent hiring of an independent contractor, statutory employment, motor carrier safety regulations, and negligent overloading of the truck. It was also here where Ramirez and Crosby specifically alleged that Gonzalez assumed a duty to Ramirez. On May 26, Ramirez and Crosby filed their second supplemental response to Gonzalez's motion for summary judgment. In it, Ramirez and Crosby attempt to adopt portions of the arguments raised by Jackson in his own hybrid motion for summary judgment. More specifically, Ramirez and Crosby's post-judgment response attempts to adopt Jackson's contentions regarding negligent overloading and various arguments he makes regarding statutory employment and the FMCSR.

Attempt to Amend Pleadings Post-Judgment

Generally, the trial court has wide latitude in permitting amendments. See Boarder to Boarder Trucking, Inc. v. Mondi, Inc., 831 S.W.2d 495, 499 (Tex.App.—Corpus Christi 1992, no writ). However, courts consistently agree that it is too late to amend the pleadings after judgment has been rendered. See, e.g., Prater v. State Farm Lloyds, 217 S.W.3d 739, 741 (Tex.App.—Dallas 2007, no pet.); Marshall v. Sackett, 907 S.W.2d 925, 929–30 (Tex.App.—Houston [1st Dist.] 1995, no writ). To illustrate, in Prater, plaintiffs filed their second amended petition alleging for the first time a breach of contract cause of action against State Farm Lloyds, one of the two defendants in that case. See Prater, 217 S.W.3d at 741. The second amended petition, however, was filed after the trial court had signed an order granting a take-nothing summary judgment in favor of State Farm Lloyds. Id. In its later final judgment, which also disposed of the claims against the second defendant, the trial court stated that it considered plaintiffs' second amended petition "untimely" and "treated [it] as a

24

nullity." See id. The Prater court concluded that the trial court correctly refused to consider the petition filed after the trial court granted summary judgment in favor of State Farm Lloyds. Id. (citing TEX. R. CIV. P. 166a(c)'s principle that the trial court should render summary judgment based on pleadings on file at time of hearing).

Ramirez and Crosby's Third Amended Petition was filed after the trial court entered summary judgment in favor of Gonzalez on all of Ramirez and Crosby's claims against him at the time summary judgment was rendered. Ramirez and Crosby's attempt at amending their petition in intervention to allege additional cause of actions was too late. See id. Allegations of assumed duty, statutory employment, FMCSR violations, negligent overloading, and negligent hiring they attempted to raise by this post-judgment amendment to their pleading were not presented to the trial court. See Marshall, 907 S.W.2d at 929–30 (citing well-established summary judgment principle that any issue not expressly presented to trial court may not be considered on appeal as grounds for reversal).

Likewise, Ramirez and Crosby's second supplemental response to Gonzalez's motion for summary judgment was too late, also having been filed after judgment had been rendered. That said, we also do not consider such response. Because no allegations of assumed duty, statutory employment, FMCSR violations, negligent overloading, or negligent hiring had been lodged against him by Ramirez and Crosby, Gonzalez had not expressly moved for summary judgment on such grounds. From that, we observe that Ramirez and Crosby's attempted adoption of Jackson's contentions in their "response" to a motion that had not been made is of no effect; it follows naturally that the trial court could not have granted summary judgment on these issues. See

<u>Prater</u>, 217 S.W.3d at 741. Summary judgment motions and responses "must stand or fall on the grounds expressly presented to the trial court." <u>D.R. Horton-Texas, Ltd. v. Markel Int'l Ins. Co.</u>, 300 S.W.3d 740, 743 (Tex. 2009) (citing <u>McConnell v. Southside Indep. Sch. Dist.</u>, 858 S.W.2d 337, 341 (Tex. 1993)).

Ramirez and Crosby's third amended petition and their second supplemental response to Gonzalez's motion for summary judgment were filed after the trial court entered summary judgment and were, therefore, too late. Consequently, neither the newly added allegations outlined in their post-judgment amended petition nor the attempted adoption of Jackson's contentions related to similar issues were before the trial court; nor are they before this Court.[3]

<u>Scope of Appellate Review</u>

Consistent with our treatment of the impact in the trial court of Ramirez and Crosby's attempted post-judgment amendment and supplementation, we must also limit the scope of our review on appeal. Appellate review of a summary judgment is limited to the record that was before the trial court when it granted summary judgment. <u>Davis v. Med. Evaluation Specialists, Inc.</u>, 31 S.W.3d 788, 793 n.4 (Tex.App.—Houston [1st Dist.] 2000, pet. denied) (op. on reh'g). So, our scope of review is limited to what was

---

[3] Our conclusion remains despite the fact that Ramirez and Crosby filed a motion for reconsideration. Ordinarily, when a motion for reconsideration or a motion for new trial is filed after summary judgment is granted, the trial court may only consider the record as it existed before granting summary judgment. <u>See</u> <u>Circle X Land & Cattle Co. v. Mumford Indep. Sch. Dist.</u>, 325 S.W.3d 859, 863 (Tex.App.—Houston [14th Dist.] 2010, pet. denied) (op. on reh'g); <u>see also</u> <u>Leinen v. Buffington's Bayou City Serv. Co.</u>, 824 S.W.2d 682, 685 (Tex.App.—Houston [14th Dist.] 1992, no writ) (concluding that "[a]ppellant, having failed to raise the issue of fraud at the summary judgment hearing, cannot raise the issue on appeal").

before the trial court at the time it granted summary judgment: Ramirez and Crosby's second amended petition alleging negligence through exercise of actual control over Garcia and by way of joint enterprise liability; Gonzalez's amended motion for summary judgment on those causes of action; and Ramirez and Crosby's Original and First Supplemental Responses to Gonzalez's motion for summary judgment.

The limited scope of our review means that the points of error Ramirez and Crosby raise on appeal which present issues of assumed duty, statutory employment under the FMCSR, and negligent hiring are not properly before us and may not serve as grounds for reversing the trial court's summary judgment. We address their two remaining points in turn: negligence relating to breach of a duty owed by way of a retained control over 3R/Garcia Trucking and negligence by application of joint enterprise liability.

Retained Control

Ramirez and Crosby contend that Gonzalez's actual control over the transportation of the silage gave rise to a legal duty on the part of Gonzalez to inspect and ensure the safety of the tandem truck used to haul silage from the field to the feedyard. That is, Ramirez and Crosby maintain that Gonzalez retained control over 3R/Garcia's hauling operations to such a degree that he owed a duty to Ramirez, an employee of an independent contractor, not to engage the services of the unsafe tandem truck.

Applicable Law

In this arena, the Texas Supreme Court adopted the rule enunciated in the Restatement (Second) of Torts:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Redinger v. Living, Inc., 689 S.W.2d 415, 418 (Tex. 1985) (expressly adopting RESTATEMENT (SECOND) OF TORTS § 414 (1977)). So, as a general rule, a general contractor does not have a duty to ensure that the independent contractor performs its work in a safe manner, unless the general contractor retains some control over the manner in which the work is done. Fifth Club, Inc. v. Ramirez, 196 S.W.3d 788, 791 (Tex. 2006); Lee Lewis Constr., Inc., v. Harrison, 70 S.W.3d 778, 783 (Tex. 2001); Redinger, 689 S.W.2d at 418. A duty may arise if the general contractor retains the right to control the means, methods, or details of the independent contractor's work. See Fifth Club, 196 S.W.3d at 791 (concluding that employer may be vicariously liable for actions of independent contractor if employer retains "some control over the manner in which the contractor performs the work that causes the damage").

The Texas Supreme Court outlined the degree of control necessary to create a duty, again referring to the Restatement's position:

> [T]he employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it

28

does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Koch Ref. Co. v. Chapa, 11 S.W.3d 153, 155 (Tex. 1999) (per curiam) (quoting and applying RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)).

A general contractor's right to control may be established through evidence of a contractual agreement that explicitly assigns the right to control the independent contractor's employee's work. See id. The right to control may also be established if the evidence demonstrates that the general contractor actually exercised control over the manner in which the independent contractor's work was performed. See id. To further delineate and clarify the issues raised by the related but distinct concepts of contractual and actual control, the Texas Supreme Court has explained that, although courts have frequently used the terms "right of control" and "retained control" interchangeably, "[t]he distinction remains important, however, because determining what a contract says is generally a question of law for the court, while determining whether someone exercised actual control is [] generally a question of fact for the jury." Lee Lewis Constr., 70 S.W.3d at 783; see Shell Oil Co. v. Khan, 138 S.W.3d 288, 292 (Tex. 2004).

In Redinger, the Texas Supreme Court held that the general contractor was liable for the actions of one independent contractor which led to another independent contractor's employee's injuries because the general contractor retained "the power to direct the order in which the work was to be done and to forbid the work being done in a dangerous manner." Redinger, 689 S.W.2d at 418. Because the general contractor's

superintendent exercised supervisory control by coordinating the work performed by two subcontractors, the general contractor owed a duty to the injured employee to exercise this supervisory control in a reasonable manner. Id.

When an independent contractor's employee fell to his death from the tenth floor of a remodeling project, the Texas Supreme Court was faced with a similar question of the general contractor's liability for the safety measures used during the project. See Lee Lewis Constr., 70 S.W.3d at 782–84. The court cited evidence that the general contractor assigned its job superintendent "the responsibility to routinely inspect the ninth and tenth floor addition to the south tower to see to it that the subcontractors and their employees properly utilized fall[-]protection equipment." Id. at 784. The evidence also indicated that the assigned superintendent "personally witnessed and approved of the specific fall-protections systems [the independent contractor] used" and "definitely did approve" the system used. Id. This evidence, the court concluded, was more than a scintilla of evidence that the general contractor retained the right to control fall-protection systems on the jobsite. Id. Therefore, the general contractor had a duty of care commensurate with that right toward the independent contractor's employee. Id.

There are also cases in which a general contractor's retained control, if any, was insufficient to give rise to a duty. For instance, an injured employee of an independent contractor argued that a duty arose based on the presence of a safety representative of the employer/premises owner and the possibility that the safety representative could intervene and forbid the employee and a co-worker from lifting a pipe in a dangerous manner. See Koch Ref., 11 S.W.3d at 156. Further, the injured employee argued, the employer's safety representatives had allegedly instructed the independent contractor's

employee in the past on the way to perform their work in a safer manner. Id. The Texas Supreme Court concluded, however, that such evidence did not rise to the level necessary to create a duty owed to the injured employee of the independent contractor. Id. The fact that a safety representative was present and able to alert the independent contractor's employees if they were doing "something wrong" was insufficient to establish that the employer exercised the degree of control necessary to create a duty. See id.; see also Dow Chem. Co. v. Bright, 89 S.W.3d 602, 608–09 (Tex. 2002). (rejecting a similar argument that presence of an employer's safety representative and representative's failure to thoroughly inspect the work area gave rise to employer's duty to ensure workplace safety). Cf. Lee Lewis Constr., 70 S.W.3d at 784 (concluding that duty owed to independent contractor's employee and citing evidence that representative observed and approved specific fall-protection system used).

Analysis

From these cases, we see that we must determine whether Gonzalez retained control of the activities or conditions that actually caused Ramirez's injuries and death. See Exxon Corp. v. Tidwell, 867 S.W.2d 19, 23 (Tex. 1993). "For liability to attach, 'the employer's role must be more than a general right to order the work to start or stop, to inspect progress or receive reports.'" Bright, 89 S.W.3d at 606 (quoting Redinger, 689 S.W.2d at 418). Here, the record reveals that an unsafe tire on the tandem truck blew out and led to Ramirez losing control of the truck. So, the question becomes whether Gonzalez retained the right to control the conditions of the trucks loaded at the field. Put another way, we must determine whether Gonzalez retained the right to determine

31

whether the tandem truck, in such condition, was used in the transport of the harvested silage. Gonzalez repeatedly maintained that he did.

Ramirez and Crosby responded to the no-evidence motion for summary judgment with, *inter alia*, Gonzalez's deposition testimony in which Gonzalez explained that the truck drivers would decide which of three available routes to take to deliver the silage to the feedyard. At one point, when asked about what he would have done if a truck entered the transport line-up but appeared to be improperly maintained, Gonzalez directed the responsibility toward the truck owners: "I think I would have left it up to them. They are the owners of the truck."

Despite this and other initial efforts to distance himself and his employees from safety related issues concerning the trucks used in transport, Gonzalez seemed to accept some degree of authority over the safety of independent contractors' equipment:

> Q: Okay. And if you had seen the condition of the tires, like are in the photographs that are part of Exhibit Number 4, would you have let Mr. Garcia slide this tandem in?
>
> A: I would have advised him about the tire. Could I have made him not haul? No, sir. I could have not loaded him, yes, sir, but I couldn't make him change the tires.
>
> Q: If you had seen the condition of the tires before the tandem was loaded, would you have loaded it and sent it on its way?
>
> A: I would advise him about it. I don't know if I could have stopped him. I probably wouldn't have loaded him.

After some efforts at clarifying questions, the exchange continued in the same vein:

> Q: If you had seen the condition of the tires like you see in these photographs, if you'd seen that before you loaded him, before you loaded the tandem, would you have loaded the tandem anyway and sent it on its way?

A: No, sir.

Q: Okay. And the reason you would not have loaded it is because of safety's sake, correct?

A: Correct, sir.

Q: And the reason you would not have loaded it is because you would have recognized the condition of the tandem as being dangerous?

A: Correct, sir.

. . .

Q: Would you have allowed the loading of a tandem that had recapped tires on the front steering axle?

A: No, sir.

Q: And that, again, is because you recognize that as a safety issue?

A: Correct. My experience . . . [is] you are not supposed to do that.

Gonzalez went on to repeat that a recapped or retreaded tire should not be on the steering axle. Gonzalez also expressed his hypothesis that Garcia felt that he could slip the unsafe tandem truck into the transport line-up because Gonzalez had not been present in the field for a few days, suggesting that Gonzalez could have refused to utilize the tandem truck and that Garcia knew that Gonzalez had that authority.

Gonzalez later elaborated on his role in the harvest and transport:

Q: Your title is owner?

A: Correct.

Q: Is that fair to say that puts you in charge out there in the field?

A: Of my machinery, yes, sir.

Q: And of your people?

A: Yes, sir.

Q: So you are in charge on which truck, because you've already told me you can tell somebody, "Don't load that truck or do load that truck," right?

33

A: Correct.

Q: So you are the person who would be in charge of making the decision to load or to not load a truck?

A: That – yes, sir.

As we have noted, because Gonzalez was ill, he did not go out to the Chester Farms field on the day of the collision. Gonzalez testified that, in his absence, Javier would take on Gonzalez's responsibilities. Gonzalez testified that Javier would have "the authority to say load or don't load" and Gonzalez would have expected Javier to only load those trucks that were safe. Gonzalez agreed, too, that Javier probably had even more experience in truck safety and maintenance than did Gonzalez.

Further, taking as true the evidence that suggested that Gonzalez had communicated with Garcia about using the tandem truck because of the sandy soil conditions at Chester Farms, we observe that there is evidence that Gonzalez specifically directed that the tandem truck be used in the transportation of the silage. See Mack Trucks, 206 S.W.3d at 582 (reciting standard that a reviewing court must review the evidence in the light most favorable to the party against whom summary judgment was rendered); Joe v. Two Thirty Nine J.V., 145 S.W.3d 150, 157 (Tex. 2004) (observing that, when reviewing summary judgment, courts must "take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor").

Gonzalez agreed that a quick visual inspection of the equipment brought to the field to transport the silage was "an important part of the process" and that he would not hire a driver who showed up to the work site in an inappropriate vehicle, such as a pick-up truck or an unsafe truck. He also acknowledged that a driver's safety record and

attitude toward safety is "a very high consideration" but testified that he had not checked into Garcia's reputation or work history prior to hiring him. Shortly after Garcia came to work for Gonzalez, Gonzalez did speak with a friendly competitor in the harvesting business and inquired into his experience working with Garcia. When asked whether he discussed with his competitor Garcia's safety history and attitude, Gonzalez explained that he did not because Garcia had already been hauling for him and Gonzalez did not feel as though safety or safety of Garcia's equipment was an issue:

> A: As far as we were concerned, he had no issues at all about safety, so the conversation never came up.
>
> Q: Who said he had no issues on safety?
>
> A: I said it didn't come up. No issue. He said he was dependable and had good equipment.
>
> Q: Oh, he did say he had good equipment?
>
> A: Yes.

Gonzalez recognized that making inquiry into a driving company's background is necessary to make sure that the equipment being used is safe. But he admitted that he did not inquire into Garcia's driver hiring process, his maintenance practice, his safety record, insurance, registration, or licensure related to the trucks to be used in transport.

It appears that Gonzalez undertook the task of checking into the safety of his independent contractor's equipment and, to some degree, personnel. And there is evidence that he retained the authority to decide which trucks would be loaded, authority which is consistent with his checking into an independent contractor's safety history. The record indicates that Gonzalez was concerned about the safety of trucks used to transport silage and that he made efforts in furtherance of his control relating to

35

the safety of trucks used in the transport. He testified that he did make a visual inspection of 3R/Garcia's three trucks when they first arrived at the field; those three trucks appeared to be late-model, well-maintained trucks and did not raise any safety concerns. The problems arose only when, either by Gonzalez's direction or by Garcia's design in Gonzalez's absence, the tandem truck showed up and, apparently, was not inspected but was loaded despite its now-recognized very poor, unsafe condition.

While not in direct control of whom the trucking companies hired as drivers or which trucks were brought to the work site and while unable to directly order or coordinate maintenance of the trucks brought to the field by independent contractors, Gonzalez maintained that he was able to refuse to fill a truck which he deemed unsafe. He went so far as to explain that, had he seen the condition of the tandem truck's tires, he would have refused to load the truck. He then testified that, in his absence from the field, his brother and employee, Javier, would be charged with that responsibility.

The cited evidence is more than a scintilla of evidence that Gonzalez retained control beyond the "general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations." See Koch Ref., 11 S.W.3d at 155 (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c). The state of the summary judgment evidence is such that "it would allow reasonable and fair-minded people to differ in their conclusions" as to whether Gonzalez retained sufficient control over the means, methods, or details of 3R/Garcia's work such that his control gave rise to a duty owed to 3R/Garcia's employee, Ramirez, to exercise reasonable care in the

36

inspection of the safety of trucks used in silage transport and the decision to disallow the use of an unsafe truck. See Forbes, Inc., 124 S.W.3d at 172.

Whether Gonzalez retained sufficient control over 3R/Garcia's operations to give rise to a general contractor's duty to exercise that control in a reasonable manner is more properly a matter for a finder of fact's determination upon examination of a fully-developed record. See Lee Lewis Constr., 70 S.W.3d at 783. Presented with the case in this procedural posture and on this record, we conclude that Ramirez and Crosby marshaled more than a scintilla of evidence that Gonzalez did retain the right to control the trucks used in silage transport, precluding a no-evidence summary judgment in Gonzalez's favor on the issue of retained right of control. We sustain Ramirez and Crosby's first point of error.

Joint Enterprise

Ramirez and Crosby also contend that there is more than a scintilla of evidence that Gonzalez and Garcia were engaged in a joint enterprise such that Gonzalez should be held liable for the negligence of Garcia. We disagree.

Applicable Law

"The theory of joint enterprise is to make each party thereto the agent of the other and thereby to hold each responsible for the negligent act of the other." Shoemaker v. Estate of Whistler, 513 S.W.2d 10, 14 (Tex. 1974). A joint enterprise signifies a legal relationship between two or more parties that imposes the responsibility upon each party for the negligent acts of the others while acting in furtherance of their

37

common undertaking. <u>Seaway Prods. Pipeline Co. v. Hanley</u>, 153 S.W.3d 643, 651–52 (Tex.App.—Fort Worth 2004, no pet.) (citing <u>Shoemaker</u>, 513 S.W.2d at 14).

To successfully allege that Gonzalez and Garcia were engaged in a joint enterprise, Ramirez and Crosby were required to show the following elements: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. <u>Shoemaker</u>, 513 S.W.2d at 16–17 (adopting RESTATEMENT (SECOND) OF TORTS § 491 cmt. c (1965)). The Texas Supreme Court has reaffirmed its position on the elements required to show joint enterprise, noting that it has "not altered <u>Shoemaker</u>'s adoption of the Restatement definition of joint enterprise." <u>See</u> <u>St. Joseph Hosp. v. Wolff</u>, 94 S.W.3d 513, 526 (Tex. 2002)

Community of Pecuniary Interest

In determining whether evidence of a "community of pecuniary interest" exists, the Texas Supreme Court has "focused upon evidence showing pooling of efforts and monetary resources between entities to achieve common purposes, namely reduction in costs and contemplation of economic gain by approaching the project as a joint undertaking." <u>Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.</u>, 58 S.W.3d 263, 276 (Tex.App.—Fort Worth 2001, pet. denied) (citing <u>Tex. Dep't of Transp. v. Able</u>, 35 S.W.3d 608, 614 (Tex. 2000)). Whether parties have a "common business or pecuniary interest" is not the same inquiry as whether they have a "community of pecuniary interest," as <u>Shoemaker</u> requires. <u>St. Joseph Hosp.</u>, 94 S.W.3d at 528.

38

Rather, a joint enterprise's "community of pecuniary interest" requires that the "monetary interest [is] common among the members of the group—it must be one 'shared without special or distinguishing characteristics.'" Id. at 531.

In finding a "community of pecuniary interest" in Able, the Texas Supreme Court relied upon evidence that the state highway had been a joint effort between the parties and involved substantial sums of money from federal, state, and local funds. See Able, 35 S.W.3d at 614. The evidence indicated that the project contemplated the parties' sharing of resources in order to make better use of these funds and demonstrated a substantial economic gain from the pooling of resources through monetary and personnel savings. See id.

Citing details of the arrangement between a hospital and a radiology group, the Fort Worth Court found no scintilla of evidence of "community of pecuniary" interest even though the agreement was a convenience to the hospital and its patients and also benefitted the radiology group. See Blackburn, 58 S.W.3d at 275–76. The court concluded that the "summary judgment evidence provided conclusively disproves any community of pecuniary interest, as it supports an independent contractor relationship." Id. at 276. Acknowledging evidence showing that "the parties generally benefitted from the arrangement," the court observed that, from the rule in Able, "more is required for a community of pecuniary interest than a generally shared business purpose." Id. at 275–76 (citing Able, 35 S.W.3d at 614).

Analysis

Likewise, in the instant cause, there was no evidence of a "community of pecuniary interest." There was no evidence that suggested Gonzalez and Garcia pooled funds and resources, as contemplated by the law of joint enterprise. See Able, 35 S.W.3d at 614. Rather, the evidence shows that Garcia provided trucks and drivers for hauling silage and was paid a sum certain per ton and per mile. Though Gonzalez and Garcia shared a common business interest in getting the silage harvested and delivered to the feedyard, their pecuniary interest was not "shared without special or distinguishing characteristics." See St. Joseph Hosp., 94 S.W.3d at 531; see also Harris v. Houston Livestock Show & Rodeo, Inc., 365 S.W.3d 28, 35 (Tex.App.— Houston [1st Dist.] 2011, pet. denied) (holding that, although one defendant benefitted by receiving percentage of revenues from drink sales made by other defendant, evidence conclusively established that the two did not share "community of pecuniary interest" when one's pecuniary interest was calculated differently from the other's). Here, the summary judgment evidence demonstrates a principal/independent contractor relationship and shows "[n]othing more than limited evidence of mere convenience to the parties arising from the arrangement and a shared general business interest," which is insufficient to establish a joint enterprise. See Blackburn, 58 S.W.3d at 277.

Because Ramirez and Crosby failed to bring forth a scintilla of evidence that Gonzalez and Garcia shared a "community of pecuniary interest," their allegation of joint enterprise fails, and the trial court properly granted Gonzalez's no-evidence summary judgment on that issue. See Chapman, 118 S.W.3d at 751. We overrule Ramirez and Crosby's second point of error.

40

Conclusion

The trial court properly granted summary judgment in favor of Gonzalez on Jackson's claims of negligent overloading and on Ramirez and Crosby's claims of negligence based on joint enterprise. We, therefore, overrule the corresponding points of error of the respective parties. We do not reach three of Ramirez and Crosby's points of error, having concluded that they were not before the trial court at the time it granted summary judgment and may not serve as bases for reversing the judgment.

No-evidence summary judgment in favor of Gonzalez was improper, however, on Jackson's claims of statutory employment and on Ramirez and Crosby's negligence claims based on retained control. We, therefore, sustain those corresponding points of error of the respective parties. Accordingly, we affirm the trial court's no-evidence summary judgment in part, reverse it in part, and remand the cause to the trial court for further proceedings consistent with this opinion. See TEX. R. APP. P. 43.2(a), (d).


                                        Mackey K. Hancock
                                        Justice


Campbell, J., concurring and dissenting.