**THAU–NOLDE, INC., a corporation, Respondent,**

v.

**KRAUSE DENTAL SUPPLY & GOLD CO., INC., a corporation, et al., Appellants.**

No. 57517.

Supreme Court of Missouri, Division No. 2.

Dec. 16, 1974.

Motion for Rehearing or Transfer to Court En Banc Denied Jan. 13, 1975.

Husch, Eppenberger, Donohue, Elson & Cornfeld, Carroll J. Donohue, Myron Gollub, Kent W. Faerber, for respondent.

Lashly, Caruthers, Rava, Hyndman & Rutherford, Paul B. Rava, Michael C. Walther, Thomas E. Tueth, St. Louis, for appellants.

STOCKARD, Commissioner.

In this suit for an injunction and for damages the defendants have appealed from a judgment adverse to them. The notice of appeal was filed prior to January 1, 1972, and appellate jurisdiction is in this court by reason of the amount in dispute.

The trial was before the court without a jury. In making our review on this appeal we determine the cause *de novo*, weigh the competent evidence introduced on the factual issues essential to the appeal, and reach our own conclusions based on the evidence, although we defer to the finding of the trial court where there is

conflicting oral testimony involving a determination of the credibility of witnesses. Martin v. Norton, 497 S.W.2d 164 (Mo. 1973). The transcript is quite lengthy, and we shall not set forth the voluminous evidence in detail, but only the substance of the facts which we deem pertinent.

Thau-Nolde, Inc., plaintiff, is engaged in the distribution and sale of dental products in the metropolitan St. Louis area and also in several nearby states. William Thau is president of the company, and Edward Plumpe is its general manager. It employs salesmen who call on dentists and obtain orders for dental products and equipment.

Defendant Krause Dental Supply & Gold Company, Inc. (hereafter referred to as "Krause-Dental") is a wholly owned subsidiary of Healthcare Corporation which, with other subsidiary corporations, is engaged in the nursing home, medical and dental supply fields. Prior to January 1970, Krause-Dental was engaged in the dental supply business exclusively in the Kansas City area. Ken Krause, Jr. (hereafter referred to as "Krause, Jr.") is the president of Krause-Dental, and Ken Krause, Sr. (hereafter referred to as "Krause Sr.") is the vice president.

In the fall of 1969, Krause Jr. conducted a survey of the business potential in the St. Louis area, and concluded that it would be advisable for Krause-Dental to enter that area.

Krause, Jr. heard from a representative of the Dental East Company in Kansas City, that Robert Redding, equipment manager for Thau-Nolde, was not satisfied with his employment and that he wanted to leave. On October 7, 1969, Krause, Jr. sent a letter to Redding asking that he call him if he was interested in employment with Krause-Dental. Redding did contact Krause, Jr., and on November 3, Krause, Jr. went to St. Louis and conferred with Redding. Krause, Jr. explained the operations of Krause-Dental, and the two discussed the possibilities of Krause-Dental expanding into the St. Louis area.

On November 8 and 9, at the time of the Mid-Continent Dental Convention in St. Louis, Krause, Jr. placed a "blind" advertisement in a St. Louis newspaper soliciting personnel experienced in the dental supply and equipment field. Apparently Krause, Jr. had told Redding of his intention to do so, because Redding told Tom Woltering, a salesman for Thau-Nolde that he was considering going to work for Krause-Dental, and that Woltering should watch the papers for the advertisement. Several responses to the advertisement were received, and Krause, Jr. sent a letter to each person asking that they complete an enclosed application for employment.

During the remainder of the year Redding talked to other employees of Thau-Nolde including Mark Kaiser and Harold Burroughs, both servicemen. He told them in effect that Krause, Jr. had visited him and was planning to bring Krause-Dental into St. Louis, and that they should watch the newspaper for another advertisement. When it appeared, Kaiser and Woltering answered it, and Redding helped Kaiser prepare his application for employment. The fact that a new dental firm was considering entering St. Louis was common knowledge among the employees of Thau-Nolde.

Mike Sickinger, a Thau-Nolde employee, called George Angers, manager of the Thau-Nolde "tooth and gold department" on the telephone and told him that Krause-Dental was to start operations in St. Louis, and because of his knowledge, Krause-Dental would like for him to be with that company. Mr. Angers subsequently answered the "blind ad" in the newspaper, and he received a letter asking for a meeting, but he did not attend.

On January 18, 1970, Redding met the two Krauses for lunch, and told them he would accept their offer of employment. A meeting was held later that day at the Hilton Inn, and in addition to the two Krauses and Redding, eight of the Thau-Nolde salesmen, three of the servicemen,

and George Angers were in attendance. Krause, Jr. testified that he was surprised that this number were present, and Redding stated that he had expected only Burns, Sickinger and Hutton from Thau-Nolde, and Rosner from St. Louis University. However, Redding had invited four of those present, and he had told Cliff Stahl to contact all Thau-Nolde employees who were interested. At this meeting Krause, Jr. announced that Krause-Dental was going to establish a place of business in St. Louis, and that Redding had been hired as general manager of the St. Louis operation. He gave a description of the policies and operations of Healthcare, and further stated that he had arranged a meeting with Mr. Thau to discuss the possibility of purchasing Thau-Nolde, but that Krause-Dental would come to St. Louis in any event. In answer to questions by some salesmen, Krause, Jr. stated that a salesman hired by Krause-Dental ordinarily would have the same territory he had with Thau-Nolde, but that some changes or adjustments might be required. At this meeting Albert Kraus, a salesman for Thau-Nolde, stated that he had talked to seventeen dentists and all but one or two indicated they would buy material from him if he went with Krause-Dental. Some of those present had not talked to any dentists about the change, and others had talked to one or two dentists. No offers of employment were made at this meeting, but Krause, Jr. announced that he would return to St. Louis the following Sunday to hold interviews with anyone who was still interested. He stated that he did not want to "sway" anyone, but that every person should make his own decision as to whether he should accept employment with Krause-Dental.

On January 19, Redding told Mr. Thau that he had accepted employment with Krause-Dental because he had not been "fully happy" with Thau-Nolde, and he believed it best to take other employment. Mr. Thau told him to "think it over very carefully." On the following day Mr. Red-

ding was called back to the office, and Mr. Grossman, an attorney, explained to Redding that he could not have divided loyalties.

On January 23, all the salesmen and George Angers met at the home of Tom Woltering. Neither Redding nor Krause, Jr. was present. Those present discussed the advantages and disadvantages of employment with each company. They also talked about whether the customers they were then serving would give their business to them for a different employer. Ralph A. Heuerman (a named defendant who is listed as Robert A. Heuerman), a salesman who subsequently left Thau-Nolde and accepted employment with Krause-Dental, testified that at this meeting Al Kraus (another Thau-Nolde employee) announced that Mr. Thau wanted to speak to all the salesmen "a week from the 23d," and that it was not "mandatory that you be there but anyone who does not will be in the blacklist." It is not clear if this was Al Kraus' opinion or if he was repeating a statement made by Mr. Thau. Al Kraus testified that at the meeting he stated he would not try to influence anyone; that everyone would have to "make up their own decision, just like [he] would." He also stated that he told Al Burroughs that whether he should leave Thau-Nolde and go to Krause-Dental was a "decision you have to make."

On January 28 Al Kraus sent a telegram to Thau-Nolde resigning his position because he was "dissatisfied" and there were "too many promises that weren't kept." However, after some meetings with Mr. Thau, he remained as an employee. When testifying he was not asked about the statement concerning a blacklist attributed to him at the meeting at the home of Woltering.

At the meeting at the home of Woltering a "vote" was taken. It is not clear as to its purpose, but the names of Mr. Thau, Mr. Plumpe, and Mr. Redding were placed on a sheet of paper. Those present then

expressed their opinion, or "voted," on whether they wanted to work for Mr. Plumpe, and the vote was nine to zero that they did not want to or preferred not to work for him. The "vote" as to Mr. Thau was six against working for him, none in favor, and there were three abstentions. At that time all the salesmen knew that Redding had accepted the position of general manager for the St. Louis activities of Krause-Dental. There was no "vote" taken as to Redding but he was discussed, and Woltering testified that "most people thought quite a bit of Mr. Redding," and the "general consensus" was favorable as to him.

Ralph Heuerman testified that at this meeting Woltering said: "Gentlemen, if we stick together we have a company in our hands" and that "we should all group together and ask for a percentage to go to Krause." But, we note that Woltering did not accept employment with Krause-Dental, and he was not asked about this statement when he testified.

On January 25, Krause, Jr. conducted personal interviews of those who had completed and returned the appliation for employment. It is not clear when this meeting was arranged. Some did not recall being informed about it at the January 18, meeting. Redding told at least three, and Stahl told one person. During the interviews, Redding was in the room at least part of the time. Burroughs testified that he and Kaiser had a joint interview, and that nothing was asked about their experience or qualifications. Later when Burroughs told Redding that he had decided to "stay with Thau-Nolde," he replied, "That's fine." During these interviews employment with Krause-Dental was offered to eight salesmen then employed by Thau-Nolde, six of whom accepted. Employment was also offered to three service men, all of whom accepted. Redding later attended a luncheon with Mr. Thau and Mr. Plumpe, and he was asked: "Bob, are you with our company?" He replied, "I think so," but nothing more was said about it.

On Saturday, January 31, Mr. Thau met with Krause, Sr. to discuss the question of the proposed purchase of Thau-Nolde. On the same day Redding and three former employees of Thau-Nolde were meeting at the Hilton Inn to go over the needed inventory for Krause-Dental and to advise Krause, Jr. what to order. Sickinger called Richard Barylski, an employee of Thau-Nolde who had not made application for employment with Krause-Dental, and stated that he had heard that Barylski was unhappy at Thau-Nolde, and if he wanted to talk to Krause, Jr. he could do so then. Krause, Jr. invited him to a party for the new Krause-Dental employees. Sickinger also called Angers, the gold and tooth man for Thau-Nolde, and asked, "Are you going with us?" That day Sickinger called Kaiser, and told him that he had heard that they were "talking him back into the fold," and that he, Sickinger, thought it was a mistake. He warned Kaiser about what he considered Thau's untrustworthiness, and that Thau would be "after him."

Krause, Jr. prepared a form letter for the Krause-Dental salemen to send to their former customers. In that letter the dentist was told that the salesman was with Krause-Dental, that he would be able to offer better service, and that the salesman would explain more about his new company.

Appellants first contend that the trial court erred in holding that they "had the burden of proof on why the temporary injunction should not issue." In view of the result we reach on the merits of the permanent injunction, we need not rule this contention.

■ Appellants also suggest reversible error on the basis of the improper admission or exclusion of evidence. As stated in Martin v. Norton, 497 S.W.2d 164 (Mo.

1973), " 'Prejudicial error' or 'reversible error' in the admission or rejection of evidence is not an issue on an appeal in an equity case [or in any case tried before the court without a jury]. The issue is whether the evidence should have been admitted and considered, or rejected and not considered, and when that issue is determined the next issue is what the judgment of the court should be, based on a consideration of the competent and admissible evidence."

The principal issue in this case is whether in view of all the evidence the trial court should have entered the judgment it did. Since this is an action for conspiracy in violation of the Missouri Antitrust Law, Chap. 416, RSMo 1969, V.A. M.S., "a violation of these statutes must be established by clear and convincing evidence and that clear and convincing evidence must certainly be more substantial evidence than that which is only sufficient to submit a case for the consideration of a jury. There must be substantial evidence of a kind and character which is clear and convincing as to the existence of the ultimate fact to be proved." State ex rel. Taylor v. Anderson, 363 Mo. 884, 254 S. W.2d 609, 615 (1953).

The trial court entered judgment that the acts of appellants constituted an unlawful conspiracy in restraint of trade in violation of § 416.040, RSMo 1969, V.A. M.S., and pursuant to § 416.090, RSMo 1969, V.A.M.S., actual damages in the amount of $117,716.55 were trebled. Upon our consideration of all the evidence, reviewed according to the rule previously set forth, we fail to find the unlawful conspiracy to restrain trade or to damage the business of respondent which is essential to maintain this action.

Prior to and at the time Krause-Dental decided to enter the St. Louis area, there was a general dissatisfaction on the part of many of the employees of Thau-Nolde. It is not necessary to pass upon the question of whether the dissatisfaction was major or minor, justified or without merit. The important fact is that many of the employees were dissatisfied, and it is a truism that dissatisfied employees will individually or collectively seek other employment.

We also note that there is no contention that any of the employees of Thau-Nolde were under a contract of employment for a term, or that in consideration of their employment any had agreed, in the event of termination of employment, not to compete with Thau-Nolde or not to work for a competitor. We also mention that there is no issue in this case concerning "trade secrets," and there is no contention that there was a breach of a confidential relationship on the part of the former employees of Thau-Nolde.

In National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 26–27 (Mo. banc. 1966), this court stated:

"The law recognizes that employees may agree among themselves to compete with their then employer upon termination of their employment. * * * Such employees are not limited merely to so agreeing during their employment with the employer with whom they intend to compete. They may plan and prepare for their competing enterprises while still employed. * * * If such right is to be in any way meaningful for an employee not under contract for a definite term, it must be exercisable without the necessity of revealing the plans to the employer."

This court then considered the issue of an unlawful conspiracy and the purpose of the antitrust laws to a situation where a number of the employees of one company form a competing enterprise, and stated:

"The problem in this case comes down to one of how much latitude of conduct may be allowed the defendants who decided to compete with their former employer. 'Two conflicting public policies are apparent. On the one hand there is the deeply imbedded tradition that favors the protection of a person's property in-

terest in his business from unfair competition. What a person has labored for should be protected from wrongs by others. On the other hand there is the equally strong, if not stronger policy which favors free competition in the economic sphere of our society. As a corollary a person has the right to improve his socio-economic status, even if the resulting effect is somewhat detrimental to the business interest of his former employer. It is necessary that there be a balancing of the equities between these two rights, for if the former is carried to its extreme it will deprive a man of his right to earn a living; while conversely, the latter right if unchecked, would probably make a mockery of the fiduciary concept, with its commitments of loyalty and fair play.'" (l.c. 39).

Respondent states that Perryton Wholesale, Inc. v. Pioneer Distributing Co. of Kansas, 353 F.2d 618 (10 Cir. 1965), is "the leading case establishing [its] position." That case upheld a Sherman Act violation where a competitor raided a competing company's key employees in order to gain confidential information and customers in a widespread territory. As pointed out in Metal Lubricants Co. v. Engineered Lubricants Co., 411 F.2d 426, 430 (8 Cir. 1961), the court in the Perryton case "relied upon the dicta" of Hitchman, Coal & Coke Co. v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260 (1917). Also, it is important to note that while the term of employment was at the will of either party, each employee had contracted not to enter the employer's business in specified areas for the term of one year after termination of employment. Therefore, to offer the employees a place with the competitor was not to obtain their services, but to damage the business of the former employer. We do not consider the Perryton case to be controlling.

■ We find no evidence that there was any intent or motive to damage the business of Thau-Nolde, other than would nat-urally result from the loss of services of any employee by reason of resignation or death. It is true that one employee was reported to have said, "if we stick together we have a company in our hands," but it appears that "the company" was Krause-Dental and not Thau-Nolde, and also the employee who was reported to have said this did not resign from Thau-Nolde and did not accept employment with Krause-Dental. We conclude from our consideration of the evidence that certain frustrated and dissatisfied employees of Thau-Nolde learned that a new dental supply house was to start business in St. Louis, and because of the general dissatisfaction and the warnings of Mr. Thau that the company had too much "deadwood," that he had six applications from "topnotch men," and that if they did not like the way the company was being managed they could get out, they sought employment from the new company. This, they were entitled to do, singly or collectively.

■ Neither do we find any unlawful act on the part of Krause Jr. or Redding. When Krause-Dental decided to operate in St. Louis, which it had a right to do, Krause, Jr. sought the needed and necessary employees, and he preferred to obtain experienced personnel. He had heard that Redding was not satisfied with his employment at Thau-Nolde, and Krause, Jr. sent word to him that if he was interested in working for Krause-Dental to get in touch with him. Redding then told other employees of Thau-Nolde about the intentions of Krause-Dental which he had a right to do, and he told them that there would be an advertisement in the newspaper for experienced personnel. No employee of Thau-Nolde was offered employment who did not request an application for employment with Krause-Dental. As stated in the National Rejectors case, "We follow the rule that an employee may leave his employment and establish a new enterprise in competition with the former employer, absent a valid restrictive covenant therefor, or breach of a confidential rela-

tionship, and in connection therewith utilize his knowledge, memory, skill and experience gained from his former employment." (409 S.W.2d l.c. 51) None of these restrictions is applicable here.

Respondent argues quite strongly concerning the fact that some of the salesmen talked to dentists to see if they would continue to purchase through the salesman if he changed employment. There is no contention that any dentist was a partner in the alleged conspiracy, and it would be most unlikely that any salesman-employee would change employment without consulting his customer. The attitude of the dentist-customers could very well be the deciding factor in a salesman's decision to remain with Thau-Nolde or accept employment with Krause-Dental.

The inferences respondent would have us draw, and which are necessary to sustain the judgment, are not justified on the whole record. Compare Metal Lubricants Co. v. Engineered Lubricants Co., supra. Thau-Nolde has not met its burden of proof to show an illegal conspiracy, and that part of the judgment assessing damages, imposing an injunction, and awarding attorneys' fees must be reversed. However, the judgment also included a set-off against Thau-Nolde in favor of six former employees for earned commissions, and they are now entitled to a judgment in their favor for these commissions. The judgment also contained a provision in favor of Thau-Nolde "and third party defendants and against Robert E. Redding, C. Jack Burns, Terry McGinnis, Mike Sickinger and Bill Pitman on their pension plan counterclaim." There was nothing presented on this appeal concerning this last matter, and we do not know if its validity depends upon the validity of the injunction and the action for damages.

The judgment is reversed and the cause remanded for the entry of a judgment consistent with the views here expressed, and for such other orders as may be appropriate in the premises.

HOUSER, C., concurs.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the court.

All of the Judges concur.