**Opinion filed January 16, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00142-CV

_____

## DORA JO MOTLOCH, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JAMES MOTLOCH, DECEASED, Appellant

## V.

## ALBUQUERQUE TORTILLA COMPANY, INC., Appellee

**On Appeal from the 70th District Court**
**Ector County, Texas**
**Trial Court Cause No. A-128,142-A**

### M E M O R A N D U M   O P I N I O N

Dora Jo Motloch, individually and on behalf of the Estate of James Motloch, deceased, sued Albuquerque Tortilla Company, Inc., alleging claims for negligent

hiring and various theories of vicarious liability arising out of a fatal accident between the Motlochs and Johnny Rafael Marmolejo Jr. We affirm.

*Background Facts*

Albuquerque Tortilla manufactures almost seven million tortillas each week and distributes its products to retail stores, restaurants, and "mom-and-pop stores" in five states. Albuquerque Tortilla sold its products directly to some of its customers, hired drivers to deliver its products in the Albuquerque area, and contracted with "eight or nine" independent operator distributors to deliver its products in the other markets. The distributors worked with each individual store to set delivery times, rotated the products on the shelf for freshness, and removed stale products. When the company hired or fired a distributor, it had "no process of finding a replacement" because "[p]eople would be jumping at the opportunity to fill it" and "because there are so many operators out there that are better in running the business."

Indeed, when Curtis Lathram, who owned D&D Distributing, heard that Albuquerque Tortilla lost its distributor in the west Texas and New Mexico territory, he contacted the company, and they began the negotiation process. According to the Independent Operators Agreement (IOA) that the parties entered into, Albuquerque Tortilla required that D&D maintain insurance, adhere to time frames and the store policies of its retail and restaurant customers, rotate the product on the shelves in retail stores, and maintain an adequate inventory. The IOA expressly states that "any personnel employed or otherwise utilized by either" party will not be an employee but, instead, will be characterized as "contract labor."

D&D was already distributing bakery products in part of the territory under contract. Lathram made some of the deliveries himself, and he hired Johnny Marmolejo Sr. to make deliveries in other areas. Johnny Marmolejo Jr. made the

2

deliveries during the week while his father was at work at his full-time job, and when his father was off work, the Marmolejos made deliveries together. Marmolejo Sr. arranged to use an Enterprise truck to make deliveries, and on at least one occasion, Marmolejo Jr. used his personal truck to pull a trailer to make his deliveries.

One early morning as Marmolejo Jr. was driving to Hobbs, New Mexico, for a delivery, he rear-ended a vehicle driven by Dora Jo Motloch; she had stopped in the left lane to make a left-hand turn. Marmolejo Jr. was traveling almost seventy miles per hour when he struck the vehicle. Dora Jo Motloch was severely injured, and both passengers, including her husband, were killed. Motloch sued, among others, the Marmolejos, Lathram, D&D, and Albuquerque Tortilla.

The trial court rendered summary judgment in favor of Albuquerque Tortilla, severed those claims, and ordered that they be dismissed with prejudice. On appeal, Motloch contends that the trial court erred when it granted summary judgment for Albuquerque Tortilla because it "did not conclusively establish its right to judgment on [three] of the theories" alleged at trial. In five issues,[1] Motloch challenges the trial court's judgment on her claims for negligent hiring, vicarious liability claims arising from a joint enterprise, and vicarious liability claims under the Texas Motor Carrier Safety Regulations.

We review a trial court's ruling on a traditional motion for summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We must determine whether the movant established that no genuine issue of material fact existed and that the movant was entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546,

---

[1]Although Motloch presents five issues on appeal, only four were argued, and the numbering is inconsistent. The first issue presented generally challenges the trial court's grant of summary judgment; Issues 2 through 5 were argued as Issues 1 through 4. Also, Issues 2 and 5 (as presented, but Issues 1 and 4 as argued) attack different elements (duty and causation) of the same claim.

548–49 (Tex. 1985); *Apcar Inv. Partners VI, Ltd. v. Gaus*, 161 S.W.3d 137, 139 (Tex. App.—Eastland 2005, no pet.). To be entitled to summary judgment, a defendant must either negate an element of each of the plaintiff's causes of action or establish an affirmative defense as a matter of law. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997).

We consider the summary judgment evidence in the light most favorable to the nonmovant and indulge all reasonable inferences and resolve all doubts in favor of the nonmovant. *Am. Tobacco*, 951 S.W.2d at 425; *Nixon*, 690 S.W.2d at 548–49. "When the trial court does not specify the basis for its summary judgment, the appealing party must show it is error to base it on any ground asserted in the motion." *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995). We consider only the grounds that "the movant actually presented to the trial court" in its motion. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996).

In her second issue on appeal, Motloch contends that the trial court erred when it granted summary judgment in favor of Albuquerque Tortilla on its claim for negligent hiring. Motloch does not challenge D&D's status as an independent contractor but argues that Albuquerque Tortilla owed a duty to the general public to "assess the drivers delivering its products" and "to adopt and enforce policies with respect to its drivers' qualifications" because it exercised control over the details of the work to be performed. Albuquerque Tortilla argues that "there is no established legal duty that would have required [it] to investigate the employment/retention policies or procedures utilized by an independent contractor." In its motion for summary judgment, it argued that there was no ongoing duty to supervise D&D's hiring activities "absent some evidence, which is not present here, of retained control or the actual exercise of control by

4

[Albuquerque Tortilla] over [D&D's] work, activities, and responsibilities." We agree.

Texas recognizes a claim for negligent hiring. That claim arises when there is a lack of the use of ordinary care when hiring an independent contractor. *Wasson v. Stracener*, 786 S.W.2d 414, 422 (Tex. App.—Texarkana 1990, writ denied); s*ee also King v. Assocs. Commercial Corp.*, 744 S.W.2d 209, 213 (Tex. App.—Texarkana 1987, writ denied); *Jones v. Sw. Newspapers Corp.*, 694 S.W.2d 455, 458 (Tex. App.—Amarillo 1985, no writ). If the performance of the contract requires driving a vehicle, the person employing the independent contractor is required to investigate the independent contractor's competency to drive. *See Wasson*, 786 S.W.2d at 422. But when the negligence arises out of the activity being performed under the contract, the duty to see that work is performed in a safe manner "is that of the independent contractor" and not that of the party who hired the independent contractor. *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985) (quoting *Abalos v. Oil Dev. Co. of Tex.*, 544 S.W.2d 627, 631 (Tex. 1976)).

However, when the hiring party exercises control over the independent contractor's work, "he may be liable unless he exercises reasonable care in supervising" the independent contractor's work. *Id.* Texas has adopted the following rule from the Restatement (Second) of Torts:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

RESTATEMENT (SECOND) OF TORTS § 414 (1965); *Redinger*, 689 S.W.2d at 418. We apply this rule "when the employer retains some control over the manner in which the independent contractor's work is performed, but does not retain the degree of control which would subject him to liability as a master." *Redinger*, 689

5

S.W.2d at 418. "The employer's role must be more than a general right to order the work to start or stop, to inspect progress or receive reports." *Id.*

In addition to the IOA, the summary judgment evidence shows that Albuquerque Tortilla did not dictate when deliveries were made; D&D "negotiate[d] dock and door times with each individual store." To comply with its requirement to "maintain an adequate inventory," D&D determined what was adequate to "keep the shelves full based on the amount of space within each individual store." D&D determined what products and what quantities that it would need to order from Albuquerque Tortilla, and there were no minimum prices or quantities. If there were any complaints about the products or the service, D&D was not obligated to relay this information to Albuquerque Tortilla. Albuquerque Tortilla never required D&D to adopt or comply with hiring procedures, and D&D determined how it made the deliveries in its distribution territory.

Lathram, the owner of D&D, testified that he was not aware of whether Albuquerque Tortilla knew whether he was making deliveries himself or knew if D&D had hired drivers, and when asked whether they talked about it, he said, "No. They could care less." Lathram testified that he had "very little" contact with Albuquerque Tortilla after he signed the contract. Chris Martinez, who represented Albuquerque Tortilla in a pretrial deposition, explained that some distributors deliver the product and some hire a driver. When asked about D&D specifically, Martinez said, "It's not my business to know if he has drivers or not." He further explained, "I can't tell them what to do with their drivers. We are not associated other than manufacturer to distributor."

Although Motloch contends that Albuquerque Tortilla's "duty emanates from the control" that it retained over the details of the work, we find no such evidence after a review of the summary judgment evidence. Motloch does not explain how Albuquerque Tortilla exercised control over the hiring of drivers or

6

the manner of delivery, nor does she direct us to any evidence showing such control. Moreover, Motloch's argument relative to breach of this alleged duty—that Albuquerque Tortilla "*should have* required D&D to adopt and enforce policies with respect to its drivers' qualifications"—further indicates that Albuquerque Tortilla did not exercise control over D&D's hiring or its distribution operations. We conclude that Albuquerque Tortilla had no duty to supervise the actions of D&D because it did not exercise the requisite control. Therefore, the trial court did not err when it concluded that Albuquerque Tortilla was entitled to judgment as a matter of law on Motloch's negligent hiring claim. Motloch's second issue is overruled.

In her fifth issue, Motloch contends that Albuquerque Tortilla proximately caused the accident because of its negligent hiring and retention practices. Because we conclude that Albuquerque Tortilla did not have a duty in this regard, we need not address whether breach of that duty was the proximate cause of the accident. Motloch's fifth issue is overruled.

In her fourth issue on appeal, Motloch argues that Albuquerque Tortilla was not entitled to summary judgment on her joint enterprise claim because, of the two elements challenged below, Albuquerque Tortilla "did not conclusively establish it was entitled to judgment as a matter of law on either point."

"The theory of joint enterprise is to make each party thereto the agent of the other and thereby to hold each responsible for the negligent act of the other." *Shoemaker v. Estate of Whistler*, 513 S.W.2d 10, 14 (Tex. 1974). "A joint enterprise signifies a legal relationship between two or more parties that imposes the responsibility upon each party for the negligent acts of the others while acting in furtherance of their common undertaking." *Ramirez v. Garcia*, 413 S.W.3d 134, 154 (Tex. App.—Amarillo 2013, no pet. h.) (citing *Seaway Prods. Pipeline Co. v. Hanley*, 153 S.W.3d 643, 651–52 (Tex. App.—Fort Worth 2004, no pet.)).

7

Texas has adopted the definition of joint enterprise from the Restatement of Torts. *Shoemaker*, 513 S.W.2d at 14; *see also St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 526 (Tex. 2002). To prevail on its claim that Albuquerque Tortilla and D&D were engaged in a joint enterprise, Motloch was required to show the following elements: (1) an express or implied agreement among the members; (2) a common purpose; (3) community of pecuniary interest in the purpose; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 613 (Tex. 2000) (quoting RESTATEMENT (SECOND) OF TORTS § 491 cmt. c (1965)). Albuquerque Tortilla challenged only the "community of pecuniary interest" and "equal right of control" elements in its motion for summary judgment, so we must determine whether it negated either element to be entitled to judgment as a matter of law.

To show a community of pecuniary interest, the supreme court has focused "upon evidence showing pooling of efforts and monetary resources between entities to achieve common purposes, namely reduction in costs and contemplation of economic gain by approaching the project as a joint undertaking." *Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary*, 58 S.W.3d 263, 276 (Tex. App.—Fort Worth 2001, pet. denied) (citing *Able*, 35 S.W.3d at 614). The "monetary interest must be common among the members of the group—it must be one 'shared without special or distinguishing characteristics.'" *St. Joseph*, 94 S.W.3d at 531 (quoting *Ely v. Gen. Motors Corp.*, 927 S.W.2d 774, 779 (Tex. App.—Texarkana 1996, writ denied)).

Motloch argues that there was a joint enterprise "between two different entities whose common purpose was the distribution and sale of [Albuquerque Tortilla] products in West Texas and Eastern New Mexico." Motloch argues on appeal that "the very essence of a community interest" is when "[n]either party makes money in the absence of sales, and both parties make money upon

consummation of a transaction." Motloch reasons that "[b]oth parties benefitted financially if products sold; neither party benefitted if products did not sell. Both parties benefitted if the customer base expanded; both parties suffered if the customer base contracted."

Motloch's argument misconstrues the law of joint enterprise just as the trial court in *St. Joseph* did in its charge to the jury. 94 S.W.3d at 528. In *St. Joseph*, the court's charge required the jury to determine whether the parties had a "common business or pecuniary interest," and the supreme court clarified that this "is not the same [thing] as whether they have a 'community of pecuniary interest.'" *Id.* The court explained:

> Instructing the jury that it may find a joint enterprise based in part on a finding of a "common business or pecuniary interest" opens to vicarious liability parties who may have business or pecuniary interests in the activities of others, but whose interests in those activities are not held in community with those others because they are not shared without special or distinguishing characteristics. This is contrary to the requirements of the Restatement and *Shoemaker*. Such a charge thus misstates Texas law regarding joint enterprise.

*Id.*

Motloch's argument fails because we must distinguish between a common business purpose and a common pecuniary interest *in that purpose*. According to the terms of the IOA, Albuquerque Tortilla "retained [D&D] as an Independent Operator for the exclusive distribution of Albuquerque Tortilla Company products." D&D paid $3,000 for an exclusive distribution territory and received twenty-two percent of the net sales in that territory. D&D would have the exclusive rights for one year "[u]nless terminated earlier." Although it provided for a one year term, the IOA also stated that D&D "shall be [an] Independent Operator of Albuquerque Tortilla Company only for so long as Albuquerque Tortilla Company, in its sole discretion, determines that such activity shall

9

continue." In addition, the IOA provided that "[n]either party, nor any employee or agent of such party, shall have the right to make any representation on behalf of or otherwise bind the other party." Additionally, D&D was prohibited from distributing "like items" within the territory.

Other summary judgment evidence also shows there was no pooling of risk, resources, or effort but, rather, an allocation of such. Albuquerque Tortilla bore the loss that occurred as a result of a manufacture's defect, but D&D bore the loss of unsold and returned product. The operating agreement did not provide for the pooling of expenses. Instead, Albuquerque Tortilla absorbed its own manufacturing and delivery costs, and D&D paid for the distribution costs. D&D used its own trucks and equipment to deliver the product, and Albuquerque Tortilla used its own equipment to manufacture products and its own vehicles to deliver the product to D&D's warehouse. Although D&D could increase its commissions by acquiring new retailers in its territory, its profits would always be limited to twenty-two percent of the net sales of Albuquerque Tortilla Company products because D&D was prohibited "from delivering products that competed with Albuquerque Tortilla Company products." Any increase in value to the territory would be realized by Albuquerque Tortilla, who could charge more for the exclusive rights to the territory or realize the value through a sale of the company. D&D's monetary interest, however, was limited to the commission it earned from the deliveries.

Even if Albuquerque Tortilla and D&D have a common business purpose in the "distribution and sale of [Albuquerque Tortilla] products in West Texas and Eastern New Mexico," as alleged by Motloch, the summary judgment evidence shows that the parties have different pecuniary interests in that purpose. The evidence shows that D&D used its own vehicles and drivers to haul Albuquerque Tortilla products and that D&D was paid a set percentage of net sales. The

10

evidence demonstrates that D&D was an independent contractor and shows "[n]othing more than limited evidence of mere convenience to the parties arising from the arrangement and a shared general business interest," which does not establish that the parties were engaged in a joint enterprise. *See Blackburn*, 58 S.W.3d at 277; *Ramirez*, 413 S.W.3d at 156. Although Albuquerque Tortilla and D&D shared a common business interest in distributing tortillas and other products in west Texas and eastern New Mexico, their pecuniary interest is not "shared without special or distinguishing characteristics." *See St. Joseph*, 94 S.W.3d at 531; *see also Harris v. Houston Livestock Show & Rodeo, Inc.*, 365 S.W.3d 28, 35 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (holding no "community of pecuniary interest" exists when one party's interest was calculated differently from the other's). Accordingly, summary judgment was proper on Motloch's claim under the joint enterprise theory. Motloch's fourth issue is overruled.

Motloch also sought to impose liability upon Albuquerque Tortilla under the principal of "statutory employment" set forth in the federal motor carrier safety regulations as adopted in Texas. In her third issue, Motloch challenges the trial court's grant of summary judgment on this claim.

In response to motor carriers' attempts to immunize themselves from liability by leasing trucks and characterizing drivers as independent contractors, Congress enacted the Interstate Common Carrier Act that "require[s] interstate motor carriers to assume full direction and control of the vehicles that they leased 'as if they were the owners of such vehicles.'" *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 38 (Tex. App.—Fort Worth 2002, no pet.). The Interstate Commerce Commission promulgated the Federal Motor Carrier Safety Regulations (FMCSR), which impose vicarious liability upon interstate motor carriers for the negligence of their drivers who are statutory employees. *Id.* at 38–39. The Texas Department of Public Safety has adopted a majority of the FMCSR, including the definition of

11

"employee" and "employer." 37 TEX. ADMIN. CODE ANN. § 4.11(a) (2013) (Tex. Dep't of Pub. Safety, Gen. Applicability & Definitions).

An "employer" under the FMCSR is "any person engaged in a business affecting interstate commerce who owns or leases a commercial motor vehicle in connection with that business, or assigns employees to operate it." 49 C.F.R. § 390.5 (2013). An "employee" is defined as any person "who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety." *Id.* This includes an independent contractor who is "in the course of operating a commercial motor vehicle." *Id.* In addition, a motor carrier is deemed to be a statutory employer when (1) the carrier does not own the vehicle; (2) the carrier operates the vehicle, under an "arrangement" with the owner, to provide transportation subject to federal regulations; and (3) the carrier does not literally employ the driver. *John B. Barbour Trucking Co. v. State*, 758 S.W.2d 684, 688 (Tex. App.—Austin 1988, writ denied).

The summary judgment evidence in this case negates the second element. The record shows that Albuquerque Tortilla contracted with Lathram, who owned D&D. Albuquerque Tortilla delivered its products to Lathram's warehouse. D&D contracted with Johnny Marmolejo Sr., and Marmolejo Sr. hired Marmolejo Jr. The Marmolejos negotiated their delivery schedule with each customer; the deliveries were not set by Albuquerque Tortilla.

Although he was paid seventeen percent by D&D, Marmolejo Sr. testified that he did not know what Albuquerque Tortilla paid D&D. Marmolejo Jr. testified that he did not have a contract with Lathram or D&D, that he never picked up products from the warehouse without his father, that his dealings with Lathram never went beyond "small talk," and that he never had any direct dealings with Albuquerque Tortilla. In fact, when questioned about the process for getting the products and invoicing, Marmolejo Jr. explained that he drove and that his "father

12

handled mostly all of that."  Because this evidence negates the second element, which requires an "arrangement" between Albuquerque Tortilla and the owner of the vehicle, the trial court did not err when it granted summary judgment on this claim.  Motloch's third issue is overruled.

We affirm the judgment of the trial court.


JIM R. WRIGHT

CHIEF JUSTICE


January 16, 2014

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.