

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| WESTSIDE NEIGHBORHOOD ASSOCIATION, ET AL., | ) ) ) | |
| Appellants, | ) ) | |
| v. | ) ) | WD84146 |
| GAIL MCCANN BEATTY, ET AL., | ) ) | Opinion filed: December 21, 2021 |
| Respondents. | ) ) | |

**APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
THE HONORABLE JOHN M. TORRENCE, JUDGE**

Division Three: Anthony Rex Gabbert, Presiding Judge,
Gary D. Witt, Judge and Edward R. Ardini, Jr., Judge

Four neighborhood associations appeal the judgment of the Circuit Court of Jackson County dismissing their petition for lack of standing and failure to exhaust administrative remedies. The neighborhood associations—Westside Neighborhood Association, Vineyard Neighborhood Association, Ivanhoe Neighborhood Council,[1] and Washington Wheatley Neighborhood Improvement Association ("the Associations")—initiated this action against Jackson County ("the County") and the Director of the Jackson County Assessment Department ("the Assessor"), asserting the defendants violated the federal Fair Housing Act. Specifically, the

---

[1] We acknowledge that Ivanhoe is a self-described council; however, for ease of reference, we refer to it as an association.

Associations alleged that in conducting the 2019 assessment of real property in Jackson County, the Assessor applied a valuation policy that had an adverse disparate impact on minority property owners. The Associations sought a declaration that the Assessor's 2019 policy violated the Fair Housing Act and a permanent injunction directing the Assessor and County to apply the policy "in a manner that does not cause adverse discriminatory impact on majority-Black and Hispanic neighborhoods."

The defendants moved to dismiss the petition and the trial court granted the motion, finding the Associations failed to exhaust administrative remedies as required by section 138.430, RSMo, and that they had "no standing to bring this claim since they are organizations, not owners of property." For the reasons stated below, we affirm.

## Factual and Procedural Background[2]

In Jackson County, Missouri—as in all Missouri counties—real property is assessed for tax purposes on a two-year cycle, with values being placed on properties by the Assessor in odd-numbered years. By law, the Assessor is prohibited from increasing the assessed value of any property "by more than fifteen percent since the last assessment"—excluding increases due to new construction or improvements—unless the Assessor "conduct[s] a physical inspection of such property." § 137.115.10, RSMo Supp. 2018.[3] If a physical inspection is required, "the assessor shall notify the property owner of that fact in writing and shall provide the owner clear written notice of the owner's rights relating to the physical inspection." § 137.115.11, RSMo Supp. 2018.

---

[2] In reviewing a trial court's grant of a motion to dismiss, we treat the facts contained in the petition as true and construe them "liberally in favor of the plaintiffs." *Lynch v. Lynch*, 260 S.W.3d 834, 836 (Mo. banc 2008).

[3] Unless otherwise noted, references to the Revised Statues of Missouri are to RSMo 2016.

2

The Associations are membership organizations that represent majority-Black and Hispanic neighborhoods. Following the 2019 real property assessment, the Associations initiated this action against the Assessor and the County, asserting one claim of "Adverse Disparate Impact and Discriminatory Effect in Violation of the Fair Housing Act" ("FHA").[4] They alleged the following in support of their claim.

In 2019, the Assessor used a mass valuation formula to assess the market value of properties in Jackson County, and that formula resulted in higher taxes for many. However, the Assessor did not value all of the properties marked for a greater-than-15% increase at those higher rates. Instead, aware of the statutory physical-inspection requirement, the Assessor capped increases at 14.9% for some properties rather than conducting a physical inspection. The Assessor testified before a Missouri legislative committee that, as a result of the formula her office used to determine which properties should receive tax increases, many properties (approximately 30% of properties in the county) should have received an increase in assessed value greater than 15% in 2019. However, she stated that because her office was under-resourced, she applied the 14.9% cap to some properties rather than conduct the physical inspection necessary to impose a higher-than-15% increase.

The Associations alleged that the Assessor did not apply the 14.9% cap evenly across neighborhoods: she applied the cap to many more properties in majority-White neighborhoods than in majority-Black and Hispanic neighborhoods. According to a ratio study conducted in the fall of 2019, in majority-White neighborhoods, 54.5% of properties marked by the Assessor's office for a greater-than-15% increase received the benefit of the 14.9% cap. However, in majority-Black and Hispanic neighborhoods, only 1.33% of the properties marked for a greater-than-15%

---

[4] Pursuant to the FHA, it is unlawful to "make unavailable or deny[] a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).

increase received the benefit of the 14.9% cap. Additionally, regarding the properties that received a 15%-or-greater increase in assessed value in 2019, the Assessor did not notify the property owners in writing, in advance, that she would be conducting a physical inspection of the property. Nor did the Assessor actually visit the properties marked for such an increase; instead, she relied on Google Street View photographs, which she asserted was sufficient to meet the physical-inspection requirement.

The Associations claimed that the "application of the 14.9% cap policy to some but not all properties marked for a greater than 15% increase of their last assessed value resulted in a discriminatory effect on a protected group of minority residents," and constituted a violation of the FHA. They asserted that as a result of the Assessor's application of the 14.9% cap policy, housing has been and will be made unavailable to residents of the Associations,[5] and the Associations have been and will continue to be required to shift their resources from their regular day-to-day activities in order to assist their members and the public in combating the effects of the policy. In their prayer for relief, the Associations requested that the trial court "[e]nter a declaratory judgment that the process and policy by which the Jackson County Assessor applied the 14.9% cap in valuing property violates the Fair Housing Act" and "[e]nter a permanent injunction directing defendants to apply the 14.9% cap in valuing properties in Jackson County in a manner that does not cause an adverse discriminatory impact on majority-Black and Hispanic neighborhoods."

---

[5] The Association alleged that "[i]f a property owner is not able to pay their property taxes based on the County's reassessments, and thereby has delinquent taxes that continue for three years, that property owner will face a tax foreclosure process starting in the third year of delinquency, pursuant to which their home will be sold at a foreclosure sale resulting in the eviction of the homeowner and any other occupants living in the home."

The defendants moved to dismiss the Associations' petition "for lack of standing and failure to assert a claim upon which relief can be granted pursuant to Missouri Rule of Civil Procedure 55.27(a)(6)." The defendants asserted the Associations had "an adequate remedy for administrative review as provided by the statutes," and the Associations "admittedly have failed to exhaust the required administrative remedies."

The trial court granted the motion and entered an order dismissing the Associations' petition. Relating to exhaustion, the trial court found that although the Associations "phrased their claims as a Federal [sic] Housing Act disparate-impact claim, [they] ultimately are challenging the validity and methodology of the property tax assessments," and that "[u]nder RSMO § 138.430.1, the State Tax Commission is required to 'correct any assessment shown to be unlawful, unfair, improper, arbitrary, or capricious.'" The trial court further found that "alleging a constitutional claim does not abolish the requirement to exhaust administrative remedies in this case," and because the Associations failed to exhaust their remedies, the trial court lacked subject matter jurisdiction. Relating to standing, the trial court concluded that the Associations "have no standing to bring this claim since they are organizations, not owners of property," and "Missouri law does not allow for a third party to challenge another individual's property tax assessment."

Shortly thereafter, the trial court entered an "Amended Order/Judgment" identical in substance to its previous order dismissing the Associations' petition. It is from this judgment that the Associations appeal. *See* Rule 74.01(a) (providing for appeal of "judgments" denominated as such). The Associations assert four points. In Points I and II, they challenge the trial court's finding that dismissal was warranted due to their failure to exhaust requisite administrative remedies. In Points III and IV, they challenge the trial court's finding that they lacked standing to bring their claim.

5

**Standard of Review**

We review *de novo* a trial court's dismissal for lack of standing and for failure to state a claim upon which relief could be granted. *See Airport Tech Partners, LLP v. State*, 462 S.W.3d 740, 744 (Mo. banc 2015) ("Standing is a question of law that this Court reviews de novo."); *Coleman v. Mo. Sec'y of State*, 313 S.W.3d 148, 151 & n.4 (Mo. App. W.D. 2010) (reviewing *de novo* the trial court's dismissal for failure to exhaust administrative remedies, and noting that the question presented on appeal was whether the plaintiff had stated a claim upon which relief could be granted).[6]

**Analysis**

The Associations' challenge to the 2019 assessment policy—although styled as an FHA claim—is at its core a claim that the Assessor engaged in discriminatory assessment practices, and involves analysis of the methods applied by the Assessor in valuing real properties. Pursuant to chapters 137 and 138 of the Revised Statues of Missouri, initial review of such a claim does not lie with the circuit courts.[7]

The administrative remedies set forth in chapters 137 and 138 "are part of what the Supreme Court has called 'a complex scheme of property taxation.'" *Quaker Oats Co. v. Stanton*, 96 S.W.3d 133, 137 (Mo. App. W.D. 2003) (quoting *Bartlett v. Ross*, 891 S.W.2d 114, 116 (Mo. banc 1995)); *see also State ex rel. St. Francois Cty. Sch. Dist. R-III v. Lalumondier*, 518 S.W.2d

---

[6] In *Coleman*, like here, the trial court found it lacked subject matter jurisdiction due to the plaintiff's failure to exhaust administrative remedies. *See* 313 S.W.3d at 151. However, as we explained in *Coleman*, the failure to exhaust requisite administrative remedies would not deprive a trial court of subject matter jurisdiction; thus, the trial court's dismissal was "more appropriately couched in terms of [the plaintiff's] failure to state a claim on which relief could be granted." *Id.* at 151 n.4 (citing *Webb ex rel. J.C.W. v. Wyciskalla*, 275 S.W.3d 249 (Mo. banc 2009)).

[7] Without deciding the merits of the Associations' arguments relating to standing, we accept (hypothetically, for purposes of our analysis) that the Associations have associational standing on behalf of their members and are correspondingly subject to defenses that would be available against individual property owners – in this case, failure to exhaust administrative remedies.

638, 640 (Mo. 1975) ("The General Assembly has provided a comprehensive plan for the assessment and equalization of the value of property" for tax purposes.).

Under this "comprehensive scheme," complaints about property assessments shall be brought before a county board of equalization ("board of equalization"), which has the duty to "hear complaints and equalize the valuation and assessments upon all real and tangible personal property taxable by the county" and "determine all appeals from the valuation of property made by the assessor[.]" §§ 138.030.2, 138.060.1, RSMo Supp. 2018. Any appeal from a board of equalization decision concerning the correct valuation to be placed on property, the method or formula used in determining the valuation of property, or the assignment of a discriminatory assessment shall be brought before the state tax commission, and the commission shall "correct any assessment or valuation which is shown to be unlawful, unfair, improper, arbitrary or capricious." § 138.430.1. A person aggrieved by the commission's decision may then seek judicial review. *Id.* It is only "[w]hen challenges to taxes do ***not*** involve questions of valuation, equalization, or any other issue in § 138.430, [that] no administrative appeals are required." *Quaker Oats*, 96 S.W.3d at 138 (emphasis added).

The process set out in chapters 137 and 138 is not merely a procedural hurdle to judicial review: the Missouri Supreme Court has recognized "the complexities of the property tax law and acknowledge[d] the wisdom of the General Assembly in providing an administrative agency to deal with this specialized field." *State ex rel. Cassilly v. Riney*, 576 S.W.2d 325, 328 (Mo. banc 1979). In deference to the expertise of—and the authority vested in—the state tax commission ("commission"), the Missouri Supreme Court has declined to resolve issues which fall within the commission's purview. *See id.* ("[W]e must conclude from the explicit provisions of § 138.410 . . . that the General Assembly intended that the State Tax Commission should be given first

7

opportunity to enforce the 'laws relating to the general property tax,'" and thus "should be given first opportunity to resolve the assessment problem in St. Louis County."). In short, claims implicating the commission's expertise and authority should be resolved in the first instance by the commission, not the courts. *See id.* at 330 (opinion on rehearing, per curiam) ("The State Tax Commission has the lawful authority to supervise all assessing officers and boards of equalization and to exercise administrative powers with reference thereto" and "[t]he primary duty to exercise this supervising authority is in the State Tax Commission rather than the circuit courts."); *see also Westglen Vill. Assocs. v. Leachman*, 654 S.W.2d 897, 899 (Mo. banc 1983) ("This statutory system for administrative review of assessments may not be pre-empted by the courts[.]").

The Associations' claim falls within the purview of boards of equalization and the commission. Indeed, pursuant to section 138.430.1 "all questions and disputes involving . . . the assignment of a discriminatory assessment" shall be appealed to the commission. *See also Sperry Corp. v. Wiles*, 695 S.W.2d 471, 473 (Mo. banc 1985) (a plaintiff challenging an assessment as discriminatory must exhaust the administrative remedies set forth in chapters 137 and 138 prior to seeking court review). Such claims may not be brought in the first instance before a circuit court, even if the plaintiff has alleged that the discriminatory assessment resulted in a constitutional violation or a violation of federal law. *See Westglen Vill. Assocs.*, 654 S.W.2d at 899-900 (the plaintiff was required to exhaust administrative remedies—notwithstanding its characterization of its discrimination claim as an equal protection claim—because the plaintiff challenged "the method used to reach the [assessor's] result" and "methods of valuation of property are delegated to the expertise of administrative agencies."); *Devinki v. Takacs*, 875 S.W.2d 648, 650-51 (Mo. App. W.D. 1994) ("[T]he statutory scheme for redress of grievances associated with tax assessments [is] exclusive and sounding a claim on the basis of § 1983 [does] not change that.").

8

We can discern no basis to exempt discrimination claims styled as FHA claims from the "comprehensive scheme" of tax assessment and review created by our legislature.

The Associations maintain they need not exhaust administrative remedies because they are only seeking prospective relief (a declaration that the 2019 policy was unlawful and the enjoinment of its future application), as opposed to retrospective relief (tax refunds or changes to specific 2019 assessments). We find this distinction irrelevant to our analysis. Regardless what form of relief the Associations seek, they are requesting a determination on the lawfulness of an assessment policy applied by the Assessor. Such a determination necessarily involves reviewing the policy and making findings as to whether the Assessor improperly assessed properties, issues which should be resolved by a board of equalization or the commission with specialized assessment knowledge.[8] *See Morningside Cmty. Org. v. Wayne Cnty. Treasurer*, No. 336430, 2017 WL 4182985, at *2-3 (Mich. Ct. App. Sept. 21, 2017) (FHA claim brought in Michigan state court was properly dismissed for failure to exhaust administrative remedies; the "claim's gravamen" involved "factual determinations regarding improper assessments and, as such, [were] issues that [fell] within the exclusive jurisdiction or expertise of the [Michigan Tax Tribunal].").

---

[8] The Associations assert in their reply brief that an "examination of the amount of the underlying assessments is not needed," and that they "need show only that the objected-to policy, assuming it is neutral on its face, had a 'significant adverse impact on members of a protected minority group.'" (Reply Br. 10 (citing *Gallagher v. Magner*, 619 F.3d 823, 833 (8th Cir. 2010))). In *Gallagher*, the U.S. Court of Appeals for the Eighth Circuit set forth a three-step, burden-shifting analysis for disparate-impact FHA claims. *See* 619 F.3d at 833. In step one, the plaintiff "must show a facially neutral policy had a significant adverse impact on members of a protected minority group." *Id.* (internal marks omitted). If the plaintiff makes that showing, "the burden shifts to the [defendant] to demonstrate that its policy or practice had 'manifest relationship' to a legitimate, non discriminatory policy objective and was necessary to the attainment of that objective." *Id.* at 834. Finally, if the defendant shows its actions were justified, the burden shifts back to the plaintiff "to show 'a viable alternative means' was available to achieve the legitimate policy objective without discriminatory effects." *Id.* In arguing that they need only show the 2019 policy had a significant adverse impact on minorities, the Associations fail to acknowledge the remaining steps of the *Gallagher* analysis, steps which would necessarily involve determinations regarding the reasonableness of the Assessor's methods of assessment and whether there existed viable alternative assessment methods she could have employed.

Because the Associations' challenge to the 2019 property assessment was ultimately a claim of discriminatory assessment, and such a claim may not be brought in the first instance in a circuit court, we find the trial court did not err in dismissing the Associations' FHA claim.[9]

**Conclusion**

The judgment of the trial court is affirmed.[10]

_____

EDWARD R. ARDINI, JR., JUDGE

All concur.

---

[9] In its judgment dismissing the Associations' claim, the trial court erroneously found it lacked subject matter jurisdiction as a result of the Associations' failure to exhaust administrative remedies. *See Shafinia v. Nash*, 372 S.W.3d 490, 494-95 (Mo. App. W.D. 2012) (The doctrine of exhaustion of administrative remedies "should no longer be understood" as a requirement of subject matter jurisdiction; rather it should "be understood as a matter of limits on the court's authority."). Regardless of the basis for dismissal cited by the trial court, as explained above, dismissal of the Associations' claim was proper. *See Clay Cty. Comm'n v. Galloway*, 615 S.W.3d 856, 860 (Mo. App. W.D. 2020) ("[I]f the court correctly dismissed the action, the ground upon which the dismissal is based is immaterial." (internal marks omitted)).

[10] Because we find that the Associations' claim was one which was subject to the "comprehensive scheme" set forth in chapters 137 and 138, and thus the trial court properly dismissed their petition, we need not reach the question of whether the Associations had standing to assert their claim.

10